**Rolland L. KING and Arlene P. King, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 79–3679.

United States Court of Appeals, Fifth Circuit. Unit B

March 30, 1981.

Rehearing Denied April 29, 1981.

Curtis J. Timm, Sarasota, Fla., for plaintiffs-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Jonathan S. Cohen, David English Carmack, Tax Div., Dept. of Justice, Washington, D. C., Gilbert Andrews, Chief, Internal Revenue Service, Washington, D. C., for defendant-appellee.

Before MORGAN, FAY and FRANK M. JOHNSON, Jr., Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

This matter on appeal involves a tax refund suit submitted to the district judge primarily on stipulated facts. The taxpayer alleged overpayment of taxes in the amount of $64,348.04 on income from the sale of corporate stock. The district judge below found that the corporations in question were collapsible corporations under Section 341 of the Internal Revenue Code and that the income from the sale of stock by a major stockholder should be treated as ordinary income. Despite plaintiff's contentions that the income should have been treated as capital gain, we affirm the decision of the lower court.

Plaintiffs, Rolland L. King and his wife, Arlene P. King,[1] brought this action in the federal district court seeking a refund for taxes they claim were overpaid for the years 1968, 1969 and 1970. Although taxes had been paid on the income in question at the capital gains rate, the Commissioner of Internal Revenue determined on audit that the income was not entitled to long-term capital gains treatment and issued a deficiency notice. Plaintiffs paid the deficiency, but simultaneously filed for a refund for overpayment.

The corporations in question included South Gate Water and Sewer Company, in which the taxpayer was a 50 percent stockholder; Greater Sarasota Sewer Company,

1. This action is brought in the names of both King and his wife because they filed their income tax return jointly. Because King is the principal litigant, this opinion refers hereafter to King as the taxpayer.

in which the taxpayer was a 50 percent stockholder; Gulf Gate Utilities, Inc., in which the taxpayer was a 45 percent stockholder; and King & Smith, Inc., in which the taxpayer was a 50 percent stockholder. A tax deficiency was also found by the Commissioner and paid by the taxpayer on income from the sale of property owned by a trust in which the taxpayer held a major beneficial interest.

The taxpayer King and his partner Smith formed King & Smith, Inc. in 1954 to develop a residential area east of Sarasota known as Forest Lakes. During its first year the corporation bought an option to purchase 1200 acres east of Sarasota at $2,000 per acre (hereinafter referred to as the Minute Maid option). King & Smith, Inc. ceased developing property by the end of 1955 because the individuals King and Smith had formed another corporation, South Gate Development Company, Inc. (hereinafter referred to as South Gate Development), in March of 1955 to continue the real estate development projects. By March of 1956 the land subject to the Minute Maid option held by King & Smith, Inc. had greatly increased in value primarily because of the success of the real estate developments of the corporation. At this time the taxpayer and his partner Smith sold all of their stock in King & Smith, Inc. to one D. H. Burk for approximately $1,673,000.00, with most of the purchase price payable over time as the remainder of the Minute Maid option was exercised. A part of the option had been exercised, with some of the land having been sold to South Gate Development. In 1955, because of a requirement that residential developments have a central water supply, King and Smith formed a utility corporation, South Gate Water & Sewer Company, Inc. (hereinafter referred to as South Gate Water), to supply water to the areas developed by South Gate Development. King and Smith each owned 50 percent of the stock in the utility corporation, which obtained a water franchise from the county and constructed a central water plant. South Gate Development constructed the water lines that were to carry water from the South Gate Water

plant to the individual lots. After completion, these lines were conveyed by South Gate Development to South Gate Water without payment of consideration. In 1959 South Gate Development ceased developing property and in May of the same year, King and Smith sold all of their stock in South Gate Water to General Water Works Corp., an unrelated corporation engaged in the operation of several utility systems. Part of the purchase price was paid at closing and the remainder was paid over a period of time based upon the number of new customers connected to the system.

In 1958 Sarasota County instituted a requirement that all residential developments must be serviced by a central sewer system. King and Smith incorporated the Greater Sarasota Sewer Company to satisfy this requirement for their real estate developments, with each owning 50 percent of the stock in the corporation. The corporation obtained a sewer franchise from Sarasota County covering parts of the South Gate subdivision and other areas of Sarasota and built a plant and central disposal system. South Gate Development constructed several sewage collection systems, lift stations and other appurtenances in the area of its development within the Greater Sarasota Sewer Co. franchise. These systems were connected to the plant and central disposal system of Greater Sarasota Sewer Co. and after completion were conveyed to the sewer company without consideration. In 1965 King and Smith sold all of their stock in Greater Sarasota Sewer Co. to Florida Cities Water Company (hereinafter referred to as Florida Cities), a subsidiary of a company which operates several private utility systems. Part of the payment was made at closing and the remainder was scheduled to be paid semiannually based on the number of connections made to the system.

The taxpayer King, along with three other parties, formed in 1960 Gulf Gate Utilities, Inc. (hereinafter referred to as Gulf Gate Utilities) in which King was a 45 percent stockholder. The corporation obtained from Sarasota County both a water and sewer franchise covering an area of land south of the city known as the Gulf

Gate area. Gulf Gate Utilities built a central water and sewage plant to which sewage collection and water distribution lines built by real estate developers were connected. The R. L. King Company and the First Development Corporation, two corporations in which King was a 50 and 25 percent stockholder respectively, built sewage and water lines and connected these to the central plants of Gulf Gate Utilities. After completion these development companies conveyed the lines and appurtenances to Gulf Gate Utilities without charge. In December of 1965 the stockholders of Gulf Gate Utilities sold the stock in the corporation to Florida Cities, using a method of payment similar to the payment plan for the Greater Sarasota Sewer Co. stock.

In mid-December of 1965 both Greater Sarasota Sewer Co. and Gulf Gate Utilities filed consents with the Internal Revenue Service under section 341(f) of the Internal Revenue Code to have subsection 2 of that provision apply to the assets of the corporation. These consents, if effective, would prevent the gain from the sale of stock from being treated as ordinary income under section 341. In the years 1968, 1969 and 1970, the taxpayer reported the income from the sale of stock of all three utility companies and King & Smith, Inc. as capital gain.

The taxpayer also claims overpayment of taxes on the sale of trust property in which the taxpayer owned a 45 percent beneficial interest. The taxpayer and three other parties created a trust that operated through the Sarasota Bank & Trust Company, Account No. 398. The trust acquired approximately 390 acres of land lying east of the then developing Gulf Gate Shopping Center. Between the years 1961 and 1962 the trust sold small quantities of the property to the Sarasota County School Board, the Hillsboro Enterprises, and the R. L. King Co. with a majority of the property being sold in January of 1963 to the First

Development Corporation, in which taxpayer at that time was a 25 percent shareholder. The taxpayer reported the income from the sale of the trust property as capital gain. Having set out the factual background of the transactions involved in this case, we now turn to the legal issues before the court.

## I.

■ A threshold issue crucial to the outcome of this appeal involves the question of burden of proof. In the Commissioner's statutory notice of deficiency, the theory relied upon by the government was that the income from the sale of stock was constructive dividends to the taxpayer. The parties engaged in discovery on this theory, but three weeks before trial the government changed its theory of defense to a theory based on section 341. The taxpayer insisted that he should not bear the burden of proof regarding this new theory, and with an amended pretrial stipulation the taxpayer attempted to shift the burden of proof to the government. The stipulation indicated "[t]hat plaintiffs have the burden of proof on each issue except the utility stock issue." [2] When considered in light of the entire stipulation, however, this language is ambiguous. The full stipulation states that "[t]here is no disagreement . . . [t]hat plaintiffs have the burden of proof on each issue except the utility stock issue." A possible interpretation of this stipulation, as urged by the government, is that the parties could not agree on who had the burden of proof on the utility stock issue. Although it is not clear to this court (nor apparently to the parties) what was intended by the stipulation, we need not make that determination. A court is not bound by the parties' stipulations of law, particularly when those stipulations are erroneous. *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289, 37 S.Ct. 287, 289, 61 L.Ed. 722 (1917); *Equitable Life Assur. Soc. of United States v.*

---

2. The words "on each issue except the utility stock issue" were handwritten by the taxpayer's attorney over the typed copy and initialed by both parties. The stipulation in final form stated:

There is no disagreement as to the following issues of law:

(A). That plaintiffs have the burden of proof on each issue except the utility stock issue.

*MacGill,* 551 F.2d 978, 983 (5th Cir. 1977), *reh. denied* 554 F.2d 1065 (5th Cir. 1977).

The district judge in his opinion found that the plaintiffs had the burden of proof on all issues regardless of the fact that the government had changed its theory of deficiency before trial. Although the Tax Court rules provide for a shift in the burden of proof in certain situations,[3] and a few lower court decisions have applied a similar rule,[4] several courts have held that the burden of proof does not shift to the government in a tax refund suit where the basic theory of the deficiency notice, i. e., ordinary income, and the amount of deficiency have not changed. *See Spangler v. Commissioner,* 278 F.2d 665 (4th Cir. 1960); *Sidney v. Commissioner,* 273 F.2d 928 (2d Cir. 1960); *Arthur Sorin,* 29 T.C. 959, *aff'd.* 271 F.2d 741 (2d Cir. 1959); *Leland D. Payne,* 30 T.C. 1044, *aff'd.* 268 F.2d 617 (5th Cir. 1959). *Cf. W. H. Weaver,* 25 T.C. 1067 (1956). This rule follows from the general rule that a tax refund suit is in the nature of an action for money had and received. *See Roybark v. United States,* 218 F.2d 164, 166 (9th Cir. 1954). The taxpayer has the burden of proving both that an overpayment of taxes was made and the amount of the overpayment. *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *Bicknell v. United States,* 422 F.2d 1055 (5th Cir. 1970).

Other courts have held that the burden remains on the taxpayer even when the Commissioner relied on an entirely different theory of deficiency at the time the assessment was made. *Blansett v. United States,* 283 F.2d 474 (8th Cir. 1960); *Roybark v. United States, supra,* 218 F.2d 164. In two separate appeals from Tax Court decisions, *Cummings v. Commissioner,* 410 F.2d 675 (5th Cir. 1969) and *Bernstein v. Commissioner,* 267 F.2d 879 (5th Cir. 1959), the Fifth Circuit similarly held that it was immaterial that a deficiency assessment was based on an improper theory. If the deficiency was appropriate under any theory, the assessment must be sustained. Therefore, the rule in the Fifth Circuit, at least in a tax refund suit in district court, is that a shift in theory by the government before trial does not shift the burden of proof to the government. If a change in theory presents undue hardship to the taxpayer, it is within the discretion of the trial judge to continue the case. The parties, however, should not attempt to stipulate the burden of proof because, as a matter of law, the stipulation may be erroneous. In this case where the taxpayer attempted to stipulate the burden of proof, the court was not bound by the erroneous stipulation of law and the burden remained on the plaintiff.[5]

3. Tax Court Rule 142(a), recently amended and effective May 1, 1979, provides:

The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer, it shall be upon the respondent.

*See Daytona Beach Kennel Club, Inc.,* 69 T.C. 1015 (1978) (where the government conceded that its change in position constituted a new matter, requiring a shift in the burden of proof). *But see Estate of Zac Emerson,* 67 T.C. 612 (1977) (where court held that, where the new theory did not alter the amount of the deficiency or require the presentation of new evidence and was not inconsistent with the former theory of defense, the burden of proof did not shift).

4. *See Service Life Ins. Co. v. United States,* 189 F.Supp. 282 (D.Neb.1960), *aff'd* 293 F.2d 72

(8th Cir. 1961); *Massingale v. United States,* 3 Am.Fed.Tax R.2d 995 (D.Ariz.1959); *Sheldon Tauber,* 24 T.C. 179 (1955); *Estate of William Beale Hibbs,* 16 T.C. 535 (1951). *See also Hull v. Commissioner,* 87 F.2d 260 (4th Cir. 1937); *David v. Phinney,* 350 F.2d 371 (5th Cir. 1965) (where the court assumed, without deciding, that the burden shifted when the government defended on a ground different from that alleged in the deficiency notice). These decisions relied primarily on Tax Court decisions where a different set of procedural rules applied. When reviewing a tax refund case from the district court, we are not bound by the Tax Court Rules of Procedure and Practice nor the cases applying those rules.

5. Although the taxpayer claimed undue hardship requiring a shift in burden of proof, we reiterate that the case was submitted primarily on stipulated facts. It is not clear to the court, and appellant has not argued, that additional evidence would change the result reached in this decision.

# II.

■ The principle substantive matter on appeal to this court concerns the application of the collapsible corporation provision of Section 341 of the Internal Revenue Code of 1954 [6] to the sale of certain corporate stocks

6. 26 U.S.C. § 341 (1954). The pertinent sections as they existed in the 1954 Code (except where noted) provide as follows:

Sec. 341. COLLAPSIBLE CORPORATIONS.

(a) *Treatment of Gain to Shareholders.*—Gain from—

(1) the sale or exchange of stock of a collapsible, corporation,

(2) a distribution in partial or complete liquidation of a collapsible corporation, which distribution is treated under this part as in part or full payment in exchange for stock, and

(3) [as amended by Sec. 1(a), Act of August 22, 1964, P.L. 88–484, 78 Stat. 596] a distribution made by a collapsible corporation which, under section 301(c)(3)(A), is treated, to the extent it exceeds the basis of the stock, in the same manner as a gain from the sale or exchange of property.

to the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as otherwise provided in this section, be considered as gain from the sale or exchange of property which is not a capital asset.

(b) *Definitions.*—

(1) *Collapsible corporation.*—For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—

(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and

(B) the realization of such shareholders of gain attributable to such property.

(2) *Production or purchase of property.*—For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—

(A) it engaged in the manufacture, construction, or production of such property to any extent,

(B) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, or

(C) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, produced, or purchased by the corporation.

(3) *Section 341 assets.*—For purposes of this section, the term "section 341 assets" means property held for a period of less than 3 years which is—

(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year;

(B) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business;

(C) unrealized receivables or fees, except receivables from sales of property other than property described in this paragraph; or

(D) property described in section 1231(b) (without regard to any holding period therein provided), except such property which is or has been used in connection with the manufacture, construction, production, or sale of property described in subparagraph (A) or (B).

In determining whether the 3-year holding period specified in this paragraph has been satisfied, section 1223 shall apply, but no such period shall be deemed to begin before the completion of the manufacture, construction, production, or purchase.

\* \* \* \* \* \*

(d) *Limitations on Application of Section.*—In the case of gain realized by a shareholder with respect to his stock in a collapsible corporation, this section shall not apply—

\* \* \* \* \* \*

(2) to the gain recognized during a taxable year, unless more than 70 percent of such gain is attributable to the property so manufactured, constructed, produced, or purchased; and

(3) to gain realized after the expiration of 3 years following the completion of such manufacture, construction, production, or purchase.

\* \* \* \*. \* \*

(e) [as added by Sec. 20(a), Technical Amendments Act of 1958, P.L. 85–866, 72 Stat. 1606] *Exceptions to Application of Section.*—

(1) *Sales or exchanges of stock.*—For purposes of subsection (a)(1), a corporation shall not be considered to be a collapsible corporation with respect to any sale or exchange of stock of the corporation by a shareholder, if, at the time of such sale or exchange, the sum of—

(A) the net unrealized appreciation in subsection (e) assets of the corporation (as defined in paragraph (5)(A)), plus

(B) if the shareholder owns more than 5 percent in value of the outstanding stock of the corporation, the net unrealized appreciation in assets of the corporation (other than assets described in subparagraph (A)) which would be subsection (e) assets under clauses (i) and (iii) of paragraph (5)(A) if the shareholder owned more than 20 percent in value of such stock, plus

(C) if the shareholder owns more than 20 percent in value of the outstanding stock of the corporation and owns, or at any time during the preceding 3-year period owned, more than 20 percent in value of the outstanding stock of any other corporation more than 70 percent in value of the assets of which are, or were at any time during which such shareholder owned during such 3-year period more than 20 percent in value of the outstanding stock, assets similar or related in service or use to assets comprising more than 70 percent in value of the assets of the corporation, the net unrealized appreciation in assets of the corporation (other than assets described in subparagraph (A)) which would be subsection (e) assets under clauses (i) and (iii) of paragraph (5)(A) if the determination whether the property, in the hands of such shareholder, would be property gain from the sale or exchange of which would under any provision of this chapter be considered in whole or in part as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231(b), were made—

(i) by treating any sale or exchange by such shareholder of stock in such other corporation within the preceding 3-year period (but only if at the time of such sale or exchange the shareholder owned more than 20 percent in value of the outstanding stock in such other corporation) as a sale or exchange by such shareholder of his proportionate share of the assets of such other corporation, and

(ii) by treating any sale or exchange of property by such other corporation within such 3-year period (but only if at the time of such sale or exchange the shareholder owned more than 20 percent in value of the outstanding stock in such other corporation), gain or loss on which was not recognized to such other corporation under section 337(a), as a sale or exchange by such shareholder of his proportionate share of the property sold or exchanged,

does not exceed an amount equal to 15 percent of the net worth of the corporation. This paragraph shall not apply to any sale or exchange of stock to the issuing corporation or, in the case of a shareholder who owns more than 20 percent in value of the outstanding stock of the corporation, to any sale or exchange of stock by such shareholder to any person related to him (within the meaning of paragraph (8)).

\* \* \* \* \* \*

(5) *Subsection (e) asset defined.*—

(A) For purposes of paragraphs (1), (2), and (4), the term "subsection (e) asset" means, with respect to property held by any corporation—

\* \* \* \* \* \*

(iii) if there is net unrealized appreciation on all property used in the trade or business (as defined in paragraph (9)), property used in the trade or business (as defined in paragraph (9)) which, in the hands of a shareholder who owns more than 20 percent in value of the outstanding stock of the corporation, would be property gain from the sale or exchange of which would under any provision of this chapter be considered in whole or in part as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231(b); and

\* \* \* \* \* \*

(6) *Net unrealized appreciation defined.*—(A) For purposes of this subsection, the term "net unrealized appreciation" means, with respect to the assets of a corporation, the amount by which—

(i) the unrealized appreciation in such assets on which there is unrealized appreciation, exceeds

(ii) the unrealized depreciation in such assets on which there is unrealized depreciation.

(B) For purposes of subparagraph (A) and paragraph (5)(A), the term "unrealized appreciation" means, with respect to any asset, the amount by which—

(i) the fair market value of such asset, exceeds

(ii) the adjusted basis for determining gain from the sale or other disposition of such asset.

(C) For purposes of subparagraph (A) and paragraph (5)(A), the term "unrealized depreciation" means, with respect to any asset, the amount by which—

(i) the adjusted basis for determining gain from the sale or other disposition of such asset, exceeds

(ii) the fair market value of such asset.

(D) For purposes of this paragraph (but not paragraph (5)(A)), in the case of any asset on the sale or exchange of which only a portion of the gain would under any provision of this chapter be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231(b), there shall be taken into account only an amount of the unrealized appreciation in such asset which is equal to such portion of the gain.

\* \* \* \* \* \*

by the taxpayer.[7] The primary purpose behind the provisions of section 341 is to prevent the taxpayer from converting what would otherwise be ordinary income into capital gain by liquidating or selling the stock of a corporation before realization of substantial income. *See generally* B. Bittk-er & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 12.04 (4th Ed. 1979); 3B J. Mertens, *Law of Federal Income Taxation* ¶ 22.57 (Rev. Ed. 1980). The device utilized by the taxpayer for such purposes is referred to as a collapsible corporation,[8] as described in section 341(b)(1) of the Code.

(9) *Property used in the trade or business.*—For purposes of this subsection, the term "property used in the trade or business" means property described in section 1231(b), without regard to any holding period therein provided.

\* \* \* \* \* \*

(f) [as added by Sec. [1](a), Act of August 22, 1964, P.L. 88–484, 78 Stat. 596] *Certain Sales of Stock of Consenting Corporations.*—

(1) *In General.*—Subsection (a)(1) shall not apply to a sale of stock of a corporation (other than a sale to the issuing corporation) if such corporation (hereinafter in this subsection referred to as "consenting corporation") consents (at such time and in such manner as the Secretary or his delegate may by regulations prescribe) to have the provisions of paragraph (2) apply. Such consent shall apply with respect to each sale of stock of such corporation made within the 6-month period beginning with the date on which such consent is filed.

(2) *Recognition of gain.*—Except as provided in paragraph (3), if a subsection (f) asset (as defined in paragraph (4)) is disposed of at any time by a consenting corporation (or, if paragraph (3) applies, by a transferee corporation), then the amount by which—

(A) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

(B) in the case of any other disposition, the fair market value of such asset,

exceeds the adjusted basis of such asset shall be treated as gain from the sale or exchange of such asset. Such gain shall be recognized notwithstanding any other provision of this subtitle, but only to the extent such gain is not recognized under any other provision of this subtitle.

\* \* \* \* \* \*

(4) *Subsection (f) asset defined.*—For purposes of this subsection—

(A) *In general.*—The term "subsection (f) asset" means any property which, as of the date of any sale of stock referred to in paragraph (1), is not a capital asset and is property owned by, or subject to an option to acquire held by, the consenting corporation. For purposes of this subparagraph, land or any interest in real property (other than a security interest), and unrealized receivables or fees (as defined in subsection (b)(4)), shall be treated as property which is not a capital asset.

(B) *Property under construction.*—If manufacture, construction, or production with respect to any property described in subparagraph (A) has commenced before any date of sale described therein, the term "subsection (f) asset" includes the property resulting from such manufacture, construction, or production.

(C) *Special rule for land.*—In the case of land or any interest in real property (other than a security interest) described in subparagraph (A), the term "subsection (f) asset" includes any improvements resulting from construction with respect to such property if such construction is commenced (by the consenting corporation or by a transferee corporation which has agreed to the application of paragraph (2)) within 2 years after the date of any sale described in subparagraph (A).

(5) *5-year limitation as to shareholder.*—Paragraph (1) shall not apply to the sale of stock of a corporation by a shareholder if, during the 5-year period ending on the date of such sale, such shareholder (or any related person within the meaning of subsection (e)(8)(A)) sold any stock of another consenting corporation within any 6-month period beginning on a date on which a consent was filed under paragraph (1) by such other corporation.

\* \* \* \* \* \*

7. This discussion of collapsibility applies only to the South Gate Water and Greater Sarasota Sewer utility corporations because the district court found the consent filed under § 341(f) effective as to Gulf Gate Utilities, Inc. Although a consent was also filed as to Greater Sarasota Sewer, the court applied the five year limitation rule under § 341(f)(5) to find that the consent was effective to the sale of stock of only one of the corporations. Except for the effective consent of Gulf Gate Utilities, Inc., the discussion that follows would apply to that utility corporation as well.

8. The Fourth Circuit in *Burge v. Commissioner*, 253 F.2d 765, 767 (4th Cir. 1958), described a collapsible corporation as "a corporation which is made use of to give the appearance of a long term investment to what is in reality a mere venture or project in manufacture, production or construction of property, with the view of making the gains from the venture or project

The provisions of section 341(b)(1) define a collapsible corporation as "a corporation formed or availed of principally for the manufacture, construction, or production of property, [or] for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), ... with a view to—(A) the sale or exchange of stock by its shareholders ... before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property." 26 U.S.C. § 341(b)(1).

■■■ Based on the foregoing definition, the taxpayer first argues that the utility corporations in question were formed principally for the operation of the utility franchises, not for the construction of property. Although this stated purpose is a reasonable one and the one most likely found in the corporations' articles of incorporation, the court is not bound to accept the self-serving statements of the taxpayer as to intent. The purpose of a corporation is determined from the function of the corporation, not the underlying motives of the taxpayer. *See Braunstein v. Commissioner*, 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963); *Estate of Van Heusden v. Commissioner*, 369 F.2d 119 (5th Cir. 1966). In a case such as this one where the only live

testimony is that of the taxpayer, the court may look to the activities that took place and from those activities draw the inference that the corporation was formed for the construction of property. *See Payne v. Commissioner*, 268 F.2d 617, 621 (5th Cir. 1959). This judicial finding is subject to the clearly erroneous standard on review, and we find that in this case the determination was not clearly erroneous. Furthermore, the language of section 341 provides that a corporation *availed of* for the construction of property may also be deemed collapsible.[9] Although the ultimate purpose of the utility corporations may have been to provide utility services, the corporations were at least availed of for the construction of the utility systems.

■■■ Taxpayer further suggests that the construction of the utility system was incidental to the purpose of the corporation and consumed only a brief period of time when considered in light of the entire length of the franchise grant.[10] Apparently this claim is based on the word "principally"[11] as used in section 341(b)(1) and on the definition of collapsible corporation as explicated by Treasury Regulation section 1.341–5(b)(3). The regulation provides that the construction of property must be substantial in relation to the other activities of the corporation. First, the taxpayer misreads the provision as a restriction or qualification for finding a corporation collapsible. Subsection (a) of the regulation clearly

taxable, not as ordinary income, as they should be taxed, but as long term capital gains."

The collapsible corporation idea was initially used primarily in the motion picture industry, but quickly spread to other business ventures, particularly those in the building construction industry. *See* B. Bittker & J. Eustice, *supra* at 12.01.

**9.** *See J. D. Abbott*, 28 T.C. 795 (1957), *aff'd* 258 F.2d 537 (3rd Cir. 1958). *See also Payne v. Commissioner*, 268 F.2d 617 (5th Cir. 1959) (where the Fifth Circuit limited the application of the phrase "availed of" to require that the corporation be "availed of ... with the view to" the collapse of the corporation before a substantial realization of income).

**10.** Construction on the central plants of South Gate Water was completed prior to 1958, and construction on the central plant of Greater

Sarasota Sewer was completed prior to 1961. These dates, however, are not the controlling dates because of our holding discussed below concerning completion of construction.

**11.** At one time commentators speculated that the word "principally" should modify the phrase "with a view to." However, several courts have now held that "principally" must be read to modify the phrase "manufacture, construction, or production of property." *Farber v. Commissioner*, 312 F.2d 729 (2d Cir.) *cert. denied* 374 U.S. 828, 83 S.Ct. 1867, 10 L.Ed.2d 1051 (1963); *Mintz v. Commissioner*, 284 F.2d 554 (2d Cir. 1960); *Burge v. Commissioner*, *supra*, 253 F.2d 765; *Weil v. Commissioner*, 252 F.2d 805 (2d Cir. 1958). *See* B. Bittker & J. Eustice, *supra*, at 12–8.

264

provides that the regulation only describes situations that will usually result in the finding that collapsibility is or is not appropriate. Furthermore, the specific provision cited by the taxpayer requires that *"[a]t the time of the manufacture, construction, production, or purchase ... such activity was substantial in relation to the other activities of the corporation."* Treas.Reg. § 1.341–5(b)(3) (1955) (emphasis added). The regulation is not requiring substantial activity during the length of time the corporation may exist, i. e., the length of the franchise grant, but simply indicates that the activity must be substantial during the time of construction. During the time of the only actual construction by the utility corporations,[12] the construction was the primary, if not only, activity of the corporation. During construction of the entire water and sewer systems, construction was still a significant enough activity of the corporation to constitute substantial activity. Therefore, the provisions of the Regulations do not affect the decision of the court below.

In addition to our technical examination under the regulation, we find in agreement with the lower court that the construction of the water and sewer systems was not incidental, but rather was crucial, to the operation of the utility franchises. Without the construction of the utilities' water and sewer systems, the purposes of the utility corporations could not be accomplished. The district court did not err in finding that for the purposes of section 341 treatment, the corporations in question were formed, or at least availed of, principally for the construction of property.

■ Taxpayer further argues that the limited activity of the utility corporations toward the building of the utility systems was not sufficient to constitute "construction" by the corporation. The taxpayer suggests that the corporation primarily only purchased and installed equipment for the central plants, with the bulk of the construction on the utility systems' water lines

and sewer connections being done by private developers. The taxpayer's argument, however, must fail. The courts have held that minimal acts constitute sufficient activity to satisfy the requirement of construction or production of property. *See, e. g., Farber v. Commissioner,* 312 F.2d 729 (2d Cir.), *cert. denied* 374 U.S. 828, 83 S.Ct. 1867, 10 L.Ed.2d 1051 (1963) (payments of fees for zoning permits and payment for utility connections held to be sufficient for a finding of collapsibility); *Abbott v. Commissioner,* 258 F.2d 537 (3d Cir. 1958) (contract for sale of land with agreement to install streets, sewers and utilities sufficient for a finding of collapsibility). Furthermore, the provision of section 341(b)(2)(A) permits a finding of collapsibility if the corporation "engaged in the manufacture, construction, or production of property *to any extent.*" (emphasis added). The construction activity of the corporations that consisted of constructing the central water and sewer plants of the utility systems was sufficient to satisfy the requirement of construction under section 341(b).

■ Recent cases have held that the development of intangible property is included in the concept of production or construction of property. *Estate of C. A. Diecks,* 65 T.C. 117 (1975) (development of cable vision system and related franchise in production of property within the meaning of § 341(b)(1)); *Computer Sciences Corp.,* 63 T.C. 327 (1974) (development of a computer program for preparation of income tax return was production of property within the meaning of § 341(b)(1)). We hold in this case that in addition to the construction of the system, the development of the utility system franchises was production of intangible property within the meaning of § 341(b)(1).

■ The final definitional challenge by the taxpayer is based on the controversial phrase of section 341(b)(1) requiring that the construction of property, etc. occur "with a view to" the sale or exchange of

12. See note 10 *supra.* Taxpayer suggests that this construction is the only construction relevant under § 341.

stock before the realization of substantial income along with the realization of gain by the taxpayer. The requisite view must exist prior to completion of the construction or production of property by the corporation. *See* Treas.Reg. § 1.341.2(a)(3); *Payne v. Commissioner, supra*, 268 F.2d 617. The taxpayer argues that the construction of property by the corporation, i. e., the construction of the central water and sewer plants, was completed prior to the time that the view to sell the stock existed.[13] However, the finding made by the lower court and affirmed by this court is that the construction by the corporation was the construction of the entire water system. The completion dates of the central plants are not controlling because construction on substantial parts of the water system continued as additional water and sewer lines were constructed and connected to the main system.[14] At least one court has held that the laying of lines, in that case cable lines, and the connecting of new customers was continuous activity that constituted construction.[15] We agree with that reasoning, particularly in light of our opinion that the purpose of the utility corporations was construction of utility systems. It is irrelevant that private developers actually constructed the lines, connected them to the system, and then transferred them to the utility corporations. Such arrangements are common among real estate developers where utility systems are required. Nevertheless, the construction by the private developer is deemed construction by the utility corporation for purposes of section 341 because the utility corporation had as its purpose and function the construction of a utility system. This court will not permit a technical arrangement involving construction to defeat the finding of collapsibility. Where corporations were formed or availed of principally for the construction of utility systems, the construction of the systems continued during construction of the entire system whether carried out by the utility corporations or by private developers.[16]

Taxpayer has emphatically argued to this court that a utility corporation has never been held to be a collapsible corporation and could not be because of the positions previously argued. We have disposed of the technical arguments made under section 341(b)(1). Concerning taxpayer's final appeal, the Code section in question sets no limitation on the kinds of corporations subject to its provisions. Although section 341 (formerly section 117(m)) was originally designed to control tax abuses in the movie and construction industries, any corporation which satisfies the definitional requirements may be collapsible. The Tax Court in *Estate of C. A. Diecks, supra*, 65 T.C. 117, held that a cable vision corporation operating under a franchise grant was collapsible. The factual similarity between the two kinds of corporations is obvious. Both the utility and the cable services involve franchises that provide from a centralized network services to individual homes. The cable and utility networks providing the service are operated and maintained by the corporations. Although many utility corporations may not satisfy the statutory requirements, the special circumstances of this case permit a finding that the corporations were collapsible. Therefore, despite taxpayer's argument that a utility corporation has never been held to be collapsible, we find in agreement with the lower court that the corporations in question satisfied the basic statutory requirements and were indeed collapsible corporations.

### III.

 Having concluded that the corporations were collapsible under section

---

13. *See* note 12 *supra.*

14. *See* note 10 *supra.*

15. *Estate of C. A. Diecks, supra*, 65 T.C. at 123.

16. In this case the record reveals that the private development companies transferring the lines and appurtenances to the utility corporations were for the most part corporations in which taxpayer held a controlling interest. Although not of particular legal significance in the case, this fact indicates the "close ties" between the developer and the utility corporations.

341(b), we must consider the taxpayer's arguments concerning exceptions and limitations to the basic definitional requirements. Under section 341(d)(2) taxpayer cites the limitation requiring that at least 70 percent of the gain on the sale of stock must be attributable to the constructed property in order for the corporation to be deemed collapsible. The taxpayer argues that the gain was primarily attributable to the franchises, the customer lists and connecting lines. Although some of the gain was most likely attributable to these assets of the corporation, Treasury Regulation Section 1.341–4(c)(3) provides that gain may be "attributable to" the constructed property even when the gain is represented by appreciation in other property.[17] In the present case little or no gain would have accrued without the construction of the central water system. Because the gain attributable to the franchises, customer lists, and connecting lines was the result of the construction of the central water system, the gain on these assets was attributable to the property actually constructed by the utility corporations.[18] Furthermore, construction may be attributed to a corporation other than the one that actually performed the construction. See Jack Farber, 36 T.C. 1142, aff'd 312 F.2d 729 (2d Cir. 1963). Thus, even if the gain was attributed to the property constructed by the private developers, and this construction was not deemed construction by the corporation, the gain would still be attributed to the "constructed property" for the purpose of section 341(d)(2). As we have held previously in this case, the taxpayer had the burden of proof on the utility stock issues. This burden included the responsibility for proving the amount of gain attributable to assets other than the constructed property,[19] and failing to carry this burden, the taxpayer shall not be allowed to prevail on a theoretical application of the limitation.[20]

In a final argument urging exemption from section 341 treatment, taxpayer suggests that the exception of section 341(e) is applicable. The provisions of section 341(e) were enacted primarily to provide exceptions in situations where property held by corporations, if held by individuals, would have afforded capital gain treatment on its sale.[21] The assets of a corporation are considered at both a corporate and shareholder level to determine whether a significant increase in value has occurred of assets which would produce ordinary income upon sale. If the net unrealized appreciation in the "tainted" assets, i. e., or ordinary income assets in the hands of the corporation or certain shareholders, is more than 15 percent, the corporation is not entitled to relief under section 341(e).

■ Crucial to the application of section 341(e) to a corporation is the definition of

---

17. Treas.Reg. § 1.341–4(c)(3) (1955).

18. As we have held, the actual construction by the utility corporations was not the only construction of the corporations for purposes of § 341. Nevertheless, we present this more narrow view in response to taxpayer's argument.

19. See C. B. Spangler, 32 T.C. 782 (1959) aff'd 278 F.2d 665, cert. denied, 364 U.S. 825, 81 S.Ct. 63, 5 L.Ed.2d 54 (1960); Raymond G. Burge, 28 T.C. 246 (1957), aff'd 253 F.2d 765 (4th Cir. 1958).

20. In addition, appellant initially argued that the exception of § 341(d)(3) applied to prevent collapsibility of Gulf Gate Utilities because the sale of stock took place more than three years after completion of construction. Appellant's Brief, p. 34. Apparently, counsel for the appellant misstated himself and intended to make that argument regarding the Greater Sarasota Sewer Co. because the district judge deemed the § 341(f) consent effective as to Gulf Gate Utilities. See note 7 supra. Appellant, however, did not clarify the point concerning § 341(d)(3) in his reply brief, and apparently abandoned the argument. Even if the argument was made as to Greater Sarasota Sewer, however, our previous holding regarding completion of construction indicates that construction of the sewer system took place within three years before the date of the sale of stock.

The argument has not been made that § 341(d)(3) applied to prevent collapsibility of South Gate Water because the facts revealed that construction of one of the central water plants was not completed by South Gate Water until 1957. The stock of the corporation was sold in 1959, less than three years after completion of construction.

21. See B. Bittner & J. Eustice, supra, at 12–26.

"subsection (e) assets," as described in section 341(e)(5)(A) of the statute. Taxpayer in this case bases his argument under section 341(e) on the ground that the utility corporations owned no subsection (e), i. e., ordinary income, assets, and therefore had zero unrealized appreciation in subsection (e) assets. However, taxpayer erroneously bases his position that the corporations held no subsection (e) assets on the assumption that "(t)hese assets as they relate to utility-type corporations have to be inventory, stock in trade or property held primarily for sale to customers in the ordinary course of business." [22] Under section 341(e)(5)(A)(iii), property used in the trade or business [23] is a subsection (e) asset if its sale would produce ordinary income in the hands of a more than 20 percent shareholder. The water and sewer systems were such property because they were property used in the trade or business that in the hands of the taxpayer would have produced ordinary income upon sale. The district judge found that the taxpayer was in the business of developing real estate. That finding is not clearly erroneous; in fact, everything in the record regarding taxpayer's business transactions and corporate involvements supports that finding. Because local ordinances required developers to provide utility services to real estate developments, the business of developing real estate was broad enough to include the development of utility systems. Thus, the gain from the sale of the utility property would have been ordinary income in the hands of the taxpayer. The utility systems owned by South Gate Water and Greater Sarasota Sewer were subsection (e) assets under the definition of section 341(e)(5)(A)(iii). The taxpayer had the burden of proof to show that the statutory requirements of section 341(e) were met. Failing to show that the net unrealized appreciation in the utility systems was not less than 15 percent of the corporation's net worth, the taxpayer cannot claim the sanctuary of section 341(e).

As the district court found, the statutory requirements of collapsible corporations were satisfied as to the South Gate Water and Greater Sarasota Sewer corporations, and none of the limitations or exceptions applied to prevent collapsible treatment. The district court was not clearly erroneous in its findings of fact and correctly concluded that these corporations were collapsible. We now turn to the question of collapsibility concerning the King & Smith, Inc. corporation.

## IV.

As the first corporation in this scenario of development corporations, King & Smith, Inc. was formed on January 15, 1954, to engage in real estate development, and in the middle of that year it acquired the Minute Maid option to purchase 1200 acres of land at $2,000 per acre. In March of 1956 the taxpayer sold his stock in the corporation at a time when the option was the only significant asset of the corporation. The government asserts, and the court below found, that the corporation was a collapsible corporation because the option was property purchased with a view to the sale of stock by its shareholders before the realization by the corporation of a substantial part of the taxable income to be derived from the property. Taxpayer, on the other hand, argues that the option was not "purchased" property within the meaning of section 341(b). Because the "purchased" property provisions apply only to "section 341 assets," these arguments require consideration of subsection (3) defining "section 341 assets."

Section 341(b)(3) includes property held for a period of less than three years which is (A) stock in trade of the corporation, or other property of a kind that would properly be included in the inventory of the

22. Appellant's Reply Brief, at p. 4.

23. Property used in the trade or business is defined in § 341(e) by reference to § 1231(b) of the Code. The provisions of § 1231(b) refer to depreciable property used in the trade or business which would not be included in the inventory of the taxpayer and is not held by the taxpayer primarily for sale to customers in the ordinary course of business. The utility systems in the present case are such property.

**268**

corporation if on hand at the close of the taxable years; (or) (B) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business ..." 26 U.S.C. 341(b)(3)(A), (B). In the present case the option arguably could be included within the provisions of subsection (A),[24] but we find that the property is more reasonably included in the provisions of subsection (B) as property held by the corporation primarily for sale to customers. It is clear from the record that the corporation first held the option to purchase the property in order to develop it. With the formation of South Gate Development in 1955 the taxpayer intended to continue the real estate development through that corporation by having King & Smith, Inc. sell the right to the option to South Gate Development as the real estate was needed. Although taxpayer sold his stock in King & Smith, Inc. in order to raise capital after only one sale to South Gate Development, the lower court properly found that the corporation held the option primarily for sale to customers in the ordinary course of business. Considering all the relevant factors in this case, we hold that the one sale to South Gate Development followed shortly by the sale of stock of the corporation was sufficient to justify the finding that the option was held primarily for sale to customers. See Estate of Van Heusden v. Commissioner, supra, 369 F.2d at 123.

Taxpayer cites the case of Levenson v. United States, 157 F.Supp. 244 (N.D.Ala.

1957), in support of his argument that the option was not a section 341 asset. That case involved the assignment of rights under an executory contract to purchase approximately 1700 trailers. In that case the defendant conceded that the contract was not stock and trade or property held by the corporation primarily for sale to customers, and the court held that the 1700 trailers subject to the executory contract were not property properly included in the inventory of the corporation. That holding pertained to matters not in issue in this case. Furthermore, the corporation in Levenson was not attempting to sell the contract itself, whereas the corporation in the present case was selling the option to purchase land. The case more appropriate for analogy is Estate of Van Heusden v. Commissioner, supra, 369 F.2d 119, where Judge Tuttle, writing for the court, held that the single sale of an option to purchase land to an ascertained purchaser was a sale of property held by the corporation primarily for sale to customers within the meaning of section 341(b).[25]

Having determined that the Minute Maid option was a section 341 asset under section 341(b)(3), we must address the taxpayer's argument that the requisite view as to the sale of stock did not exist. The taxpayer asserts, in a manner similar to his arguments pertaining to the other corporations, that King & Smith, Inc. was formed principally for the construction or development of property rather than for the pur-

---

**24.** The government has argued, as the lower court held, that the doctrine of Corn Products Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), permits a finding that this option was considered as stock in trade because the option was held as a "hedge" against land costs, i. e., as a supply of land for taxpayer's real estate development. Several courts have applied such a rationale for holding property to be other than a capital asset. Schlumberger Technology Corp. v. United States, 443 F.2d 1115, 1121 (5th Cir. 1971); Norton v. United States, 551 F.2d 821, 826 (Ct.Cl.1977). The logic of the argument as applied to a collapsible corporation is unique in that no court has applied Corn Products doctrine to satisfy the definition of a "section 341 asset." In Corn Products the Court expressly found that the assets were neither stock in trade nor property held

primarily for sale to customers under the exclusions to capital assets, but nevertheless held that the corn futures in issue were not capital assets. The definition of "section 341 assets" requires that the purchased property be stock in trade, property held primarily for sale to customers, etc., but a position similar to the one in Corn Products could be adopted and applied to the definition of "section 341 assets" so that property could be considered as stock in trade or property held primarily for sale to customers. However, because of our subsequent holding we need not reach that issue and reserve it for another day.

**25.** Estate of Van Heusden v. Commissioner, supra, 369 F.2d at 123. See also Patterson v. Belcher, 302 F.2d 289, 294 (5th Cir. 1962).

chase of the Minute Maid option. As with his previous arguments, the taxpayer ignores the possibility that the corporation was "availed of" for the purchase of the option. Under Treasury Regulation section 1.341–2(a)(3), a corporation is formed or availed of with the requisite view to the action described in section 341(b) if the sale of the stock was attributable to circumstances present at the time of the purchase. At trial the taxpayer testified that King & Smith, Inc. was undercapitalized and used the early earnings from the development project to acquire the Minute Maid option. The sale of the stock was attributed to the necessity to raise money for the development project, a situation present at the time of the purchase of the option. Therefore, the requisite view existed at the time of the sale because the sale was attributed to circumstances existing at the time of the purchase. We hold that the district court was correct in its determination that King & Smith, Inc. was a collapsible corporation, formed or availed of principally for the purchase of a section 341 asset with a view to the sale of stock by its shareholders before the realization by the corporation of a substantial part of the taxable income to be derived from the property.

## V.

Taxpayer makes the final argument that the property held by Trust Account 398, in which taxpayer was a 45 percent beneficiary, was a capital asset within the hands of the trust and that the gain attributable to that property was capital gain in the hands of the beneficiaries of the trust. Section 1221 of the Internal Revenue Code [26] states the definition of a capital asset and in subsection (1) specifically excludes "property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business." Thus, the issue here, as

was the issue with the option held by King & Smith, Inc., is whether the property held by Account 398 was held primarily for sale to customers in the ordinary course of business.

The factors to be considered in determining whether property was held primarily for sale to customers are set out in *United States v. Winthrop*, 417 F.2d 905 (5th Cir. 1969), and approved in *Biedenharn Realty Co. v. United States*, 526 F.2d 409 (5th Cir.) (en banc), *cert. den.* 469 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). These factors include the taxpayer's purpose for acquiring the property; the duration of ownership of the property; the extent and nature of taxpayer's efforts to sell the property; the number, extent, continuity and substantiality of the sales; the extent of subdividing, developing and advertising to increase sales; the use of a business office for sale of the property; the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and the time and effort that the taxpayer habitually devoted to sales. However, the ultimate determination is not to be made solely on these factors which have no independent significance. The determination of capital gain treatment must be based on the situation in its entirety and made in light of the policy behind the capital gain provisions. *See United States v. Winthrop, supra*, 417 F.2d at 910–11; *Biedenharn Realty Co. v. United States, supra*, 526 F.2d at 415. Because the lower capital gain tax is a tax preference not appropriate for profits arising from the operation of a business, the definition of capital asset must be strictly construed and its exclusions broadly applied. *Corn Products Co. v. Commissioner*, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955). On the

---

**26.** 26 U.S.C. § 1221 (1954). The provision provides in pertinent part as follows:

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be

included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

\* \* \* \* \* \*

facts of this case, the district judge concluded that the property owned by Account 398 was property held primarily for sale to customers in the ordinary course of business. As we have stated, the district court was not clearly erroneous in its determination that the taxpayer was in the business of real estate development. The property held by Account 398 was sold within three years primarily to real estate development corporations in which the taxpayer was a major shareholder. Under the circumstances involving the closely related corporations, advertising and sales activity by the trust account were unnecessary. Considering the situation under the factors of *Winthrop* and in its entirety, the property appears to have been held not for investment, but rather primarily for sale to customers in the ordinary course of business. The district court was not clearly erroneous in its determination that the property held by the trust was not a capital asset. *See Burgher v. Campbell*, 244 F.2d 863 (5th Cir. 1957); *Brown v. Commissioner*, 448 F.2d 514 (10th Cir. 1971).

Having concluded that the corporations in the case were collapsible and that the income from the trust account was ordinary income, the decision of the lower court is

AFFIRMED.

FAY, Circuit Judge, dissenting:

I respectfully dissent from the majority's opinion, except in its recitation of the facts and its treatment of Trust Account 398, with which I concur.

PROCEDURAL MATTERS

Appellant raises a number of procedural issues, some of which were dealt with in the majority opinion, which give me a great deal of concern. The initial question is which party was to bear the burden of proof on the "utility stock issue." Neither party disputes that in the ordinary case the plaintiff bears the burden of proving his entitlement to a tax refund. What then happened in this case that would make the well-accepted rule inapplicable?

The most important fact is that the appellant-taxpayer was unable to properly prepare his case because the government's theory of tax liability was constantly changing. The government's original position, that the corporations were collapsible, was totally abandoned during the administrative review process and replaced with the position that the proceeds from the sale of stock was ordinary income under Code section 482, which regulates transactions between related corporations. This second theory was also abandoned during the administrative review process. The government next issued a deficiency or "ninety day" letter in which it asserted that the receipts from the sale of corporate stock constituted constructive dividends taxable as ordinary income. By way of interrogatory, plaintiff next attempted to have this new theory of liability explained. The government refused, stating that it had no obligation to do so. At the next juncture, the pre-trial stipulation, the government abandoned the constructive dividend theory and reverted to its previously discarded theory of collapsible corporations. In apparent recognition of the unfairness of its continuous shifting in theories, the government stipulated that it would bear the burden of proof on the utility stock issue.[1] Taxpayer then moved the court for a continuance,

1. Though ultimately concluding that the resolution of the issue is unnecessary, the majority says that the stipulation as to the burden of proof is "ambiguous." I am unable, however, to discern even the slightest ambiguity in the stipulation. One of the things on which both parties agreed in the stipulation was "[t]hat plaintiffs have the burden of proof on each issue except the utility stock issue." Since there are only two parties to this action, and it was agreed that one party would bear the burden of proof on all issues but one, the stipulation indicates by negative pregnant that the other party, in this case the government, bears the burden on the remaining issue.

The majority concludes that the meaning of the stipulation need not be resolved because "[a] court is not bound by the parties' stipulation of law. . . ." *Opinion* at 258. While that is a correct statement of the law, it begs the question of whether appellant was unfairly surprised by the District Court's failure to indicate that the stipulation would not be followed. Had appellant been aware of the court's decision, it is quite likely that his case would have been presented differently.

arguing among other things that its pre-trial discovery was directed toward the constructive dividend theory of liability, not the government's latest theory. That motion was denied.

Subsequent to the trial, but prior to the entry of an order, the district judge informed both parties by letter that he would rule for the government. In that letter the court stated its conclusion that appellant-taxpayer had failed to satisfy his burden of proof, apparently ignoring the parties' stipulation as to the burden of proof on the utility stock issue. The court went on to say it was requesting that counsel for the government prepare a proposed opinion consistent with its letter, and that counsel for appellant would have ten days after receipt thereof within which to respond. In its letter the court said that during the ten day period, "I will await action . . . ." Nonetheless, the proposed opinion was entered as the order of the court on the same day it was delivered by counsel for the government, February 2, 1979. The ten day period earlier afforded appellant was rendered meaningless. Additionally, the memoranda opinion was inconsistent with the court's earlier ruling for the government, as to one of the utility companies, because the government corrected what was a clearly erroneous ruling. Needless to say that taxpayer's letter to the court, dated February 9, 1979, in which that as well as other relevant issues were raised, was mooted by the court's earlier action.

The majority opinion goes to great lengths to explain its affirmance of the District Court's handling of the case, particularly the burden of proof issue. I will not take issue with my brothers' conclusion that what transpired was legally justifiable. The issue, I believe, is not whether there was technical compliance with the rules of procedure, the issue is one of fundamental fairness on which those rules and our entire notion of due process are based. No individual or corporation should be required to pay a tax, particularly when the government demands a deficiency, without the government explaining the theory of liability on which that tax is to be assessed. In this case, it is all too clear to me that the Internal Revenue Service was determined to impose tax liability on this taxpayer one way or another. The manner in which it leap-frogged from theory to theory, abandoning each as quickly as they were proposed, must have been as dizzying to the taxpayer as it is to me. Moreover, the taxpayer's efforts to narrow and clarify the issues for the purpose of a possible settlement were met with a total lack of cooperation by the government. The District Court was made aware of all this in appellant's motion for continuance. It is beyond my understanding why the court would deny what, in view of the circumstances of the case, was such a totally reasonable request. To have proceeded to trial and ignored the parties' stipulation as to burden of proof, without at least informing the parties of that decision, only compounded the inequitable position in which the taxpayer found himself. Carnival "shell games" may be entertaining but they have no place in the legal process. Finally, to enter a memorandum opinion which was partially inconsistent with the court's instructions to the drafting party, and to do so prior to the time in which the appellant was allowed to respond, rendered this trial fundamentally unfair. No one familiar with existing caseloads can ignore the tremendous constraints and pressures under which trial judges operate. However, that should not and must not be allowed as justification for procedures that compromise basic principles of fair play. In my opinion, that has occurred here.

## UTILITY STOCK

The central issue in this case is whether certain utility corporations in which taxpayer was a major shareholder were collapsible, thereby giving rise to ordinary income on the sale of the stock therein. The majority holds that they were collapsible corporations. I disagree.

The basic requirements of collapsibility under section 341 are that a corporation be "formed or availed of" for the construction or purchase of property "with a view" to

the sale or exchange of the stock before realizing the income from the property so purchased or construed. The stock in a corporation which is determined to be collapsible is not, however, irrevocably tainted. The statute provides certain exemptions which, if applicable, allow the recognition of capital gain upon the sale of the stock. Of importance to this case is the exemption provided in section 341(d)(3), whereby the provision of section 341(a) is made inapplicable to gain from the sale of stock in a collapsible corporation which is realized three years or more following the completion of construction. On appeal, the taxpayer asserts, among other things, that section 341(b), defining collapsible corporations, is not satisfied because at the time each corporation was "availed of" there was no "view" to sell the stock,[2] or alternatively that the exemption is available because, at the time the stock sale took place, more than three years had passed since the completion of construction. I am persuaded by both of these positions.

The majority opinion responds to appellant's arguments with three simple statements of the law regarding collapsible corporations. They are: (1) the requisite "view" may exist at any time prior to the completion of construction; (2) construction is not completed until the absolute last bit of work is finished; and (3) the construction of one party can be attributed to another party.[3] From these seemingly innocent statements[4] comes the conclusion that the requisite "view" to sell would be present in this case if the appellant's stock were sold at any time while the water and sewer lines were being built and connected to appellant's central plant, despite the fact that such construction was being carried out by private developers, some of whom were to-

tally unrelated to the appellant. The majority reasons that a water and sewer plant is without utility (pardon the pun) unless it is connected to water and sewer lines running to residences and businesses. Therefore, the facility must be viewed as an entire system, no part of which is complete until all is complete.

Though having some appeal at first glance, the majority position, if followed to its logical conclusion, would achieve results far beyond the intended scope of the statute. Put simply, in the water and sewer business "construction", within the meaning of section 341, might never end. For example, assume that in 1950 a corporation was formed to provide water and sewer services to what at the time was a rural area south of the city of Atlanta. As part of the agreement to obtain its license, the utility corporation promised that it would provide services to all persons living in a five mile radius of the plant who now or in the future required such services. As time passed the area within the five mile radius of the plant became developed, until in 1965 the developable area was twenty percent inhabited. The utility corporation had had nothing to do with that development except to lay the water and sewer lines needed to provide services to the residents. For the next ten years development in that area came to a standstill, because people chose to live north of the city. In 1975 the building business returned to the area serviced by my hypothetical utility corporation. This time, however, the corporation told the builders that it would provide the services required by its license, but the private developers would have to provide the sewer and water lines. Anxious to develop their property, the builders agreed. The area became popular and it appeared that one

---

2. There has been much discussion in the academic community as to the proper interpretation of section 341. For example, does "availed of" modify "construction or purchase" or "with a view" or both? In this Circuit, at any rate, there is agreement that the corporation must be "availed of" "with a view" to sale. *See United States v. Ivey*, 294 F.2d 799, 806 (5th Cir. 1961); *Payne v. Commissioner*, 268 F.2d 617, 621 (5th Cir. 1959).

3. While the majority offers precedential support for the first two propositions, none is offered for the third. The reason for that is clear to me. Though it may be the case that in certain circumstances construction can be attributed to related parties, it is inconceivable that one corporation can be attributed the construction done by another corporation that had no relation to nor involvement with the former.

4. *But see* note 3 *supra*.

hundred percent of the developable area would be completed within two or three years. In the meantime, the stockholders in the utility corporation were approached to sell their stock to a large state-wide utility company. The offer seemed reasonable and the stockholders agreed to the sale. Following the legal analysis of the majority opinion, the gain recognized by the stockholders would be ordinary income because the corporation was collapsible. This would be true despite the facts that (1) the utility corporation was never involved in the development of real estate, (2) the corporation was actively engaged in the utility business for twenty-five years before the stock was sold, (3) no construction whatsoever took place for a ten year period, and (4) the water and sewer line construction that took place from 1975 on was done exclusively by private developers having no relationship with either the utility corporation or any of its stockholders. Surely, this illustrates that section 341 could not have been intended to be applied as the majority has done.

This case illustrates what we all must be aware of, that independent statements of the law, while possibly correct in and of themselves, cannot be forced together out of context without totally losing the meaning which they were intended to have. I fear that that is precisely what the majority has done in this case. While I agree with the majority's first two statements,[5] and could imagine a situation in which the third might be applicable, the *obvious result of* applying them jointly to the facts presented here is to establish a rule, the logical conclusion of which is untenable.

A more reasonable result in this case would be to treat the assets of the utility corporation as independent entities. That is, the utility plant should be treated as a non-collapsible asset, if construction on it was completed more than three years before the stock was sold, and the sewer and water lines, assuming there is sufficient relationship between the utility corporation and the builder to justify attributing the construction by the latter to the former,

should be evaluated separately. This notion of looking at the individual assets of the corporation rather than the corporation as a whole is not new to the law of collapsible corporations, at least with respect to the three year exemption,[6] and it makes particular sense in a case such as this in which the alternative is to view construction as continuing *ad infinitum*. In addition to the conclusion that the exemption of section 341(d)(3) applies to certain assets, this approach also justifies the conclusion that at the time construction of the plant was completed there was no "view" to sell the stock and, therefore, the corporation was not collapsible. While this conclusion would be justified, given the absence of evidence presented by the government to contradict appellant's assertion that there was no such "view", I rest my conclusion on the applicability of the three year exemption. I do so because I would be reluctant to reverse a judgment of the District Court on the question of intent, even when the appellant was the only party to offer evidence going to that issue.

## KING & SMITH, INC.—THE MINUTE MAID OPTION

The final issue on which I disagree with the majority opinion is its conclusion that the sale of stock in King & Smith, Inc. gives rise to ordinary income because it was a collapsible corporation. While I agree with the majority's instincts that this is the type of situation to which section 341 was intended to apply, I am forced by the majority's own analysis to conclude that the section is not applicable.

As was the case with the utility stock issue, the question here is whether the taxpayer had the requisite "view" to sell the stock at the relevant time. Fortunately, there is no construction involved here, only the purchase of an option, so there is no dispute that the view to sell the stock must have been present at the time the option was purchased.

In discussing whether the option was in fact "purchased" property within the meaning of section 341(b)(3) the majority says,

5. *See text* accompanying note 3 *supra.*

6. *See, e. g.*, Rev.Rul. 70–93 (1970).

"It is clear from the record that the corporation first held the option to purchase the property in order to develop it.... Although taxpayer sold his stock in King & Smith, Inc. in order to raise capital after only one sale to South Gate Development, the lower court properly found that the corporation held the option primarily for sale to customers in the ordinary course of business." *Opinion* at 268. What this says to me in clear unequivocal language is that at the time the option was purchased, the relevant time for our inquiry, the taxpayer intended to develop the property, not to sell the stock of the corporation that held the property as its major asset. Accordingly, the requisite "view" was not present and the corporation cannot be collapsible. To reach any other conclusion is inconsistent with the majority's own language. Nonetheless, the majority opinion concludes that the requisite "view" was present at the time the option was purchased. The central facts leading the majority to its conclusion were that the corporation's financial circumstances at the time of the sale were similar to those that existed at the time the option was purchased. The majority reasons that this satisfied Treasury Regulation section 1.341–2(a)(3) which states that a corporation is formed or availed with the requisite "view" if the sale of stock is *attributable* to circumstances present at the time of the purchase. I believe this reasoning is flawed. There is a substantial difference between saying that similar facts existed at the time of purchase and sale, and saying that the sale was attributable to the facts that existed at the time of the purchase. I believe that the majority's earlier conclusion that the option was originally purchased for development and sale in the ordinary course of business is inconsistent with its attribution analysis. It may very well have been the case that at both the times of purchase and sale the corporation was undercapitalized. Nonetheless, if the option was purchased for the purpose of development, it is logical that the corporation intended to improve its undercapitalized position. The fact that it was unsuccessful in its efforts cannot be determinative. The reason for the sale of the stock was the financial condition of the corporation at the time of the sale, not the condition at the time of the purchase. This must be true because, implicit in the majority's treatment of the issue, the option was purchased for the purpose of altering the weak financial condition existing at the time of said purchase. Since this is true, I must disagree with the majority's conclusion that King & Smith, Inc. was a collapsible corporation.

CONCLUSION

The mission of the Internal Revenue Service goes to the very survival of our way of life. Taxes are essential for the operation of our government. Congress imposes the rules for the imposition of most of our taxes. In the main, ours is an "honor system". Should a taxpayer fail to pay his fair share under existing rules, the Internal Revenue Service has an obligation to vigorously pursue the collection of each and every cent due and owing. When such matters reach the courts, however, the parties are equal and should be accorded equal treatment. Equal treatment, in civil cases, equates with full disclosure. Years ago we abolished "trial by ambush". Dead and buried, it should remain underground. I'm concerned it has been resurrected here and, therefore, I most respectfully dissent.