Oswill M. CUMMINGS, Jr., Petitioner-
Appellant,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellee.

No. 26653.

United States Court of Appeals
Fifth Circuit.

April 30, 1969.

**676**

S. P. Keith, Jr., Birmingham, Ala., for petitioner-appellant.

Mitchell Rogovin, Asst. Atty. Gen., Marco S. Sonnenschein, Elmer J. Kelsey, Harry Marselli, Lee A. Jackson, Attys., Tax Division, U. S. Dept. of Justice, Washington, D. C., Lester R. Uretz, Chief

Counsel, I. R. S., Washington, D. C., for respondent-appellee.

Before RIVES, BELL and DYER, Circuit Judges.

RIVES, Circuit Judge:

Oswill M. Cummings, Jr., sole proprietor of an intrastate trucking enterprise (Tuscaloosa Motor Express) operating under an Alabama Public Service Commission franchise, appeals [1] from an adverse Tax Court decision establishing his federal income tax deficiencies and penalties at approximately $33,000.00 for the taxable years 1944 to 1955. *Oswill M. Cummings, Jr.*, T. C. Memo. 1968–52. *See* 10 J. Mertens, Law of Fed. Income Taxation § 55.19, p. 4 (Jan. 1969 Supp.). We reverse and remand.

From 1945 through 1958, Cummings personally [2] conducted a freight hauling business, operating motor trucks on a regularly scheduled Birmingham and Tuscaloosa route, as well as unscheduled "interline or interchange" hauls [3] to other cities both in and out of Alabama.[4]

In the course of his business at least for the post-1956 period, Cummings maintained separate bookkeeping accounts for the three types of carriage in which he engaged: regularly scheduled, interline, and collect-on-delivery (C.O. D.).[5] Cummings' practice was to deposit all collections (scheduled, interline,

1. Jurisdiction is conferred by 26 U.S.C.A. § 7482(a). *See* Fed.R.App.P. 13 (1968).

2. While Cummings was overseas as a U. S. Army Major during 1944 and most of 1945, his trucking business was operated by his father, with assistance from his wife who held his power of attorney. He returned from Europe in 1945 and recommenced personal operation of his trucking business.

3. "Interline or interchange" hauls involve long-distance motor freight carriage which is split up among one or more carriers; charges are prorated according to the respective proportion of the haul performed by each individual trucking line.

4. Cummings specifices as error, *inter alia*, the Tax Court's finding that his interline business was merely "occasional." The Commissioner offered no evidence to rebut

testimony by Cummings and two of his accountant-bookkeepers that interline hauls represented "approximately 50% of the gross receipts," "approximately 50% of the total bank deposits," with reimbursement of 70 to 75 per cent thereof to other carriers who hauled portions of the carriage. *See* note 5, *infra;* note 3, *supra.* Yet the Tax Court subsequently allowed Cummings only a 10 per cent deduction for disbursements to other carriers of their prorata share of charges he collected in full. *See* note 15, *infra.*

5. The C.O.D. account reflected collections at the time of delivery of costs of goods and of freight charges. The interline account included total freight charge collections (either for pre-paid multi-carrier hauls or for terminal payment hauls), only a prorata share of which was income to Cummings. *See* notes 3 and 4, *supra.*

and C.O.D.) in his business account with City National Bank of Tuscaloosa. He would, thereafter, deduct his own hauling charge and remit by check the balance of each collection to the appropriate carrier, carriers or C.O.D. seller.

In February 1961, IRS agents commenced an investigation of Cummings' operations with a request for his 1959 tax return. Subsequently a request was made for Cummings' books and records for the years 1956 through 1959. There is a dispute still raging on appeal as to what response was made to the initial IRS record request.[6] Regardless of which narration is more accurate, the IRS agents successfully marshaled the information they needed for the examination of Cummings' tax affairs from 1956 forward. They secured from his bank information reflecting all *deposits* to his business [7] and personal checking accounts and savings accounts. They seized from the accountant who was preparing the requested annual profit and loss statements Cummings' business records, including cancelled checks, bank statements, depreciation records and tax-related papers.

After completion of the examination of Cummings' tax affairs for tax years 1956–1962, an IRS agent met with Cummings, his attorney and his accountant to discuss proposed adjustments. At this time, the agent informed Cummings and his advisors that an IRS search of its records reflected that he had made no income tax returns for 1944–1955.[8]

Thereafter, on two separate occasions, the agent requested Cummings' 1944–1955 business records. Standing on his construction of the alleged IRS agreement not to investigate pre-1956 tax years, Cummings' attorney advised the taxpayer not to cooperate with the agents. Consequently, the agents were forced to reconstruct Cummings' 1944–1955 tax deficiencies on the basis of nothing but his total annual deposits reflected in City National Bank records.

IRS Special Agent Mims, who reconstructed Cummings' 1944–1955 income without the aid of any information other than bank records, used the "bank deposits" computation method. Ordinarily, under the "bank deposits" method, the Commissioner is entitled to assume that *all* money deposited in a taxpayer's account during a given period constitutes taxable income since no starting point exists from which to use the preferred "net worth" method. *See* Price v. United States, 5 Cir. 1964, 335 F.2d 671, 677; *cf.* 10 J. Mertens, Law of Fed. Income Taxation § 55.19, pp. 123–124 (1965 rev. ed.). In the Cummings case, however, the peculiar bifurcated investigation of tax years 1956–1962 and 1944–1955 left the IRS in possession of all necessary records to determine actual taxable income for 1956–1962, yet with nothing but bank deposit data for 1954–1955. As a result of this situation, Agent Mims simply applied a 1956–1962 average net profits-to-deposits ratio [9] to the 1944–1955 annual bank deposits to determine respective an-

---

6. The IRS agents testified that Cummings informed them that all the books and records he had consisted of his bank account. Cummings, on the other hand, claims he and his attorney told the Agents they had records which they would turn over after his accountant had made profit and loss audits of the 1956–1959 business years.

7. The business deposits included nontaxable sums, such as C.O.D. and interline collections, as well as proceeds from a number of *discounted* bank loans.

8. The record reflects a serious conflict between Cummings and the IRS investigators as to whether an agreement had been initially made when the 1956–1959 inves-

tigation commenced that there would be no examination of pre-1956 tax years. It appears that no records were requested, at the time of the 1956–1959 investigation, for tax years 1944–1955.

9. The ratio resulted from the following formula:

*Total Adjusted Net Profits for 1956–1958* [$41,758.89] = 4.58435
Total Adjusted Net Bank Deposits for 1956–1958 [$910,900.93]

Agent Mims testified that he adjusted both profits and deposits figures to eliminate all nontaxable items for 1955–1958, such as C.O.D. and interline collections, bank loans, and real estate and vehicle

nual deficiencies, as well as the cumulative total liability with appropriate penalties. Because no business records for 1944–1955 were made available to Agent Mims, he testified that no adjustments were made to Cummings' annual bank deposits for those years to eliminate nontaxable items known to be included therein.[10]

The Tax Court held that Cummings failed to meet his burden of proving that the Commissioner's deficiency determinations for tax years 1944–1955 computed by the "bank deposits" method *(without elimination of nontaxable items not specifically documented)* was arbitrary and excessive. However, applying the *Cohan* rule,[11] the Tax Court concluded that a ten per cent reduction in annual bank deposits would be a "reasonable" allowance for nontaxable amounts collected for C.O.D. and interline hauls.

Cummings contends that the Tax Court's allowance of only a ten per cent reduction in bank deposits for C.O.D. and interline collections was based upon the "clearly erroneous" factual finding that Tuscaloosa Motor Express only "occasionally" engaged in C.O.D. and interline hauling; and he argues that he adequately carried his burden to neutralize the presumption of validity attaching to the Commissioner's deficiency determination when he proved that the application of the 1956–1958 *net* income-to-deposits ratio to the 1944–1955 *gross* bank deposits was "arbitrary and excessive." [12]

▮ We note at the outset that our scope of review in an appeal from the Tax Court is limited. *See generally* 9 J. Mertens, Law of Fed. Income Taxation §§ 51.22 through 51.27, pp. 47–94 (1965 rev. ed.). The Commissioner is required to compute taxable income "under the method of accounting * * * regularly used by the taxpayer," or, if no method was used, "under such method as * * * does clearly reflect income." Int.Rev. Code of 1954, § 446(a, b); 26 U.S.C.A. § 446(a, b). *See* Webb v. Commissioner of Internal Revenue, 5 Cir. 1968, 394 F.2d 366, 371; Miller v. Commissioner of Internal Revenue, 5 Cir. 1956, 237 F.2d 830, 838. The Commissioner may use any reasonable computation method to determine the deficiency where the taxpayer fails to maintain or produce adequate records from which actual income might be ascertained. Boyett v. Commissioner of Internal Revenue, 5 Cir. 1953, 204 F. 2d 205, 208; Kenney v. Commissioner of Internal Revenue, 5 Cir. 1940, 111 F.2d 374, 375; *see* Burka v. Commissioner of Internal Revenue, 4 Cir. 1950, 179 F.2d 483, 485. Among the recognized methods where no starting point is apparent is the "bank deposit" reconstruction method, wherein the Commissioner is entitled to assume that all bank deposits are taxable income in the absence of proof to the contrary. Price v. United States, 5 Cir. 1964, 335 F.2d 671, 677; Boyett v. Commissioner, *supra; see* Mills v. Commissioner of Internal Revenue, 4 Cir. 1968,

---

depreciation. This was possible because he had access to *complete* financial information for the years 1956–1958. There is no explanation in the record as to why, with complete financial records available and used to reconstruct Cummings' 1956–1962 tax deficiencies, Agent Mims only used the tax years 1956–1958 to determine his ratio to be applied to 1944–1955 gross bank deposits to ascertain taxable income.

10. *See* notes 5 and 7, *supra*. Agent Mims admitted that he actually had some records for real estate and vehicle depreciation dating back to 1950 which had been seized during the original post-1956 investigation. Nevertheless, without business records for 1944–1955 similar to those used for computation of 1956–1962

liabilities, Agent Mims refused to make any adjustments in 1944–1955 annual bank deposits to eliminate nontaxable items.

11. Cohan v. Commissioner of Internal Revenue, 2 Cir. 1930, 39 F.2d 540, 543–544: "Absolute certainty [in reconstruction without records] * * * is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." *See* Rogers v. Commissioner of Internal Revenue, 7 Cir. 1957, 248 F.2d 452.

12. The Tax Court judgment resolved a number of other issues against Cummings which are not challenged on appeal.

399 F.2d 744, 749; Doll v. Glenn, 6 Cir. 1956, 231 F.2d 186, 188; *see also* 10 J. Mertens, Law of Fed. Income Taxation § 55.19, pp. 123–124 (1965 rev. ed.). A presumption of correctness of the determination exists with the burden of proving otherwise on the taxpayer. Welch v. Helvering, 1933, 290 U.S. 111, 115, 54 S. Ct. 8, 78 L.Ed. 212; Webb v. Commissioner, *supra*, 394 F.2d at 372; Bryan v. Commissioner of Internal Revenue, 5 Cir. 1954, 209 F.2d 822, 825, cert. denied, 348 U.S. 912, 75 S.Ct. 289, 99 L.Ed. 715; *see* Easter v. Commissioner of Internal Revenue, 4 Cir. 1964, 338 F.2d 968, 969. Furthermore, if the assessment is right on any theory it must be sustained; it is immaterial that the theory used was wrong. Bernstein v. Commissioner of Internal Revenue, 5 Cir. 1959, 267 F.2d 879, 881; *see* Blansett v. United States, 8 Cir. 1960, 283 F.2d 474, 478. If the taxpayer believes that the Commissioner's method of computation was unfair or inaccurate, the burden is on him to show such unfairness and inaccuracy. Price v. United States, *supra*; *see* United States v. Lease, 2 Cir. 1965, 346 F.2d 696, 699–700 (preponderance of evidence standard required). Likewise, the burden is upon the taxpayer to establish a statutory right to specific deductions and to substantiate his eligibility therefor. *See* Bishop v. Commissioner of Internal Revenue, 6 Cir. 1965, 342 F.2d 757, 759; Cirillo v. Commissioner of Internal Revenue, 3 Cir. 1963, 314 F.2d 478, 483; Nowland v. Commissioner of Internal Revenue, 4 Cir. 1957, 244 F.2d 450, 453. Yet where the taxpayer has proven that he should be credited with a particular deduction, but he is unable for lack of adequate records to prove with certainty the amount, the Commissioner or the courts make an approximation of what seems reasonably allowable under the circumstances, applying what is generally called the *Cohan* principle.[13] In light of the above guidelines governing tax reconstruction methods, we recognize that we should disturb a Tax Court determination that particular bank deposits represent taxable income only if, under the circumstances of the case, such a conclusion seems speculative and arbitrary rather than rational and fair. *See* 10 J. Mertens, Law of Fed. Income Taxation § 55.19, p. 124 and cases cited at n. 65 (1964 rev. ed. with Jan. 1969 Supp.). *See also* Helvering v. Taylor, 1935, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623. As Judge Goldberg so clearly stated for this Court:

> "We recognize that the absence of adequate tax records does not give the Commissioner carte blanche for imposing Draconian absolutes. [Citations omitted.] But such absence does weaken any critique of the Commissioner's methodology. [Citations omitted]."

Webb v. Commissioner, *supra*, 394 F.2d at 373.

Although we are appalled by Cummings' obvious fraud and by his apparent unwillingness to cooperate with investigating IRS agents by refusing to turn over his 1944–1955 records, we are nevertheless constrained to agree with his contentions.

While we certainly realize that, without any business records for the 1944–1955 tax years, Agent Mims could make no adjustments to eliminate otherwise deductible nontaxable items included in the annual gross bank deposit figure for each tax year, we nevertheless conclude that his application of the 1956–1958 average *net* profits-to-*net* deposits ratio to the 1944–1955 annual *gross* deposits figures was unreasonable under the circumstances. He used as his starting point for determining the 1956–1958 ratio Cummings' *gross* bank deposits for those years. Yet he chose to use the 1956–1958 *net* bank deposits figure in his formula. The Tax Court incorporated the Mims ratio into its findings and decision and, therefore, clearly erred.

We conclude that, though weighted as it should be most heavily against the recalcitrant taxpayer and buttressed by the presumption of correctness, Agent Mims'

13. See note 11, supra.

formula adopted by the Tax Court was speculative and arbitrary because it lacked any fair and rational relation to the purpose it sought to achieve: determination of taxable income for 1944–1955, given only gross bank deposits data for those years and complete financial records for the 1956–1962 period. It would appear that a more reasonable formula, although perhaps not the only rational and fair one under the facts of this case, would have been as follows:

$$\frac{\text{Average Net Profits } [1956\text{--}1958 \text{ or } 1956\text{--}1962] \,^{14}}{\text{Average Gross Bank Deposits } [\text{Same period as above}]} = \text{ratio.}$$

Such a net profits-to-gross deposits ratio, applied to tax years 1944–1955 for which only gross bank deposit data is available, would match reasonably related financial data for different periods where either adequate or inadequate taxable income information is available. The resulting deficiency determination would be rational and fair rather than speculative and arbitrary.

Likewise, we agree with the Tax Court that the *Cohan* rule should have been used to approximate a reasonable deduction for interline and C.O.D. collections deposited in Cummings' City National Bank account, only a portion of which represented income to him. We are unable, however, to understand why the Tax Court selected its ten per cent figure. It would appear from the record that Agent Mims actually adjusted the 1956–1962 annual gross bank deposits to eliminate nontaxable portions of interline and C.O.D. collections on the basis of available records for those tax years. Yet neither the findings nor the decision of the Tax Court reflect that any resort was made to such information in establishing the ten per cent allowance.[15] We conclude that the *Cohan* rule, correctly applied, should reflect an allowance figure at least related to, if not relatively consonant with, some reasonable and fair ration of known C.O.D. and interline income-to-collections.[16]

Recomputation of the 1944–1955 taxable income figures using the recommended average net profits-to-average gross bank deposits ratio and redetermination of the *Cohan* rule allowance for nontaxable portions of C.O.D. and interline deposits—both predicated upon known and applied information for tax years 1956–1962—will then establish beyond question that the particular bank deposits method employed actually represented, under the circumstances, a rational and fair determination, rather than a conclusion such as we presently review which seems speculative and arbitrary. *See* Webb v. Commissioner, *supra*, 394 F.2d at 373; Commissioner of Internal Revenue v. Welch, 5 Cir. 1965, 345 F.2d 939, 943–944. *See also* Helvering v. Taylor, *supra*. *See generally* 10 J. Mertens, Law of Fed. Income Taxation §

14. We do not decide on review which model period—1956–1958 or 1956–1962—would be better. Such a determination is correctly for the Commissioner to make; provided a rational basis for either, both or any other period can be demonstrated to the satisfaction of the Tax Court, we are bound to affirm. See Bernstein v. Commissioner of Internal Revenue, 5 Cir. 1959, 267 F.2d 879, 881.

15. The Tax Court apparently arrived at the ten per cent figure because of its finding that C.O.D. and interline hauls were made only "occasionally." Yet the record reflects uncontroverted testimony to the effect that collections for such carriage represented better than fifty per cent of gross bank deposits. *See* note 4, *supra*. Nowhere in the trial record or Tax Court decision does the Commissioner acknowledge precisely how large a percentage of gross deposits C.O.D. and interline collections represented for tax years 1956–1962 for which business records were available and used to make appropriate adjustments to annual gross deposit figures.

16. *See* note 14, *supra*. Selection of a rational and fair model period is for the Commissioner.

55.19, p. 124 (1964 rev. ed. with Jan. 1969 Supp.).

The decision of the Tax Court is, therefore, reversed and remanded for recomputation of Cummings' 1944–1955 annual tax deficiencies consistent with some "rational and fair" computation standard.

Reversed and remanded.