In re Scott William KATZ, Debtor.

Daniel L. BAKST, Trustee and Scott William Katz, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Bankruptcy Nos. 90–39248–BKC–RAM, 92–0566–BKC–RAM–A.

United States Bankruptcy Court, S.D. Florida.

June 10, 1994.

David S. Meisel, Daniel L. Bakst, Ackerman, Bakst, Cloyd & Scherer, West Palm Beach, FL, for plaintiffs.

David R. Smith, Dist. Counsel, IRS, Kendall B. Coffey, U.S. Atty., Civ. Div., Miami, FL, A.B. Phillips, Tax Div., U.S. Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

ERWIN I. KATZ [1], Bankruptcy Judge.

The Court has before it the complaint of the trustee, Daniel L. Bakst, as trustee of the estate of Scott William Katz (Debtor), to Determine Tax Liability under 11 U.S.C. § 505 and Objection to Claims of the Internal Revenue Service (the "Government"). The Government filed a proof of claim on April 10, 1991 in the amount of $1,426,123.78 based on alleged deficiencies, interest and penalties for the years 1985 through 1988. On June 11, 1992 the trustee filed a Complaint to Determine Tax Liability and Objection to Claims of Internal Revenue Service. After the Government answered the complaint, the Debtor sought, and on June 22, 1993 was granted, leave to intervene as a party plaintiff. (The Debtor and the trustee will hereafter be referred to as the "Plaintiffs.") On June 28, 1993 the Government filed a Motion in Limine regarding the burden of proof in the adversary proceeding. On October 12, 1993 a hearing was held on the Motion in Limine, and on October 20, 1993, reading his findings and conclusions into the record, Judge Mark entered an interlocutory order placing the burden of proof on the Government. The Government appealed the October 20 ruling, and filed a Motion for Stay Pending Appeal on November 4, 1993. The Motion for Stay Pending Appeal was argued before the Court on November 9, 1993. Finding no likelihood of success on the appeal, citing *In re Rasbury*, 141 B.R. 752 (N.D.Ala.1992) and *In re Premo*, 116 B.R. 515 (Bankr.E.D.Mich.1990), Judge Mark denied the motion. That appeal is pending before the district court.[2] Trial was held and post-trial briefs have been submitted. During the course of the trial, the parties stipulated, and the Court found, that the Debtor's total revised net taxable income for 1988 amounted to $9,542.72. The parties further stipulated that there were no outstanding issues regarding the 1988 tax year. Therefore, the Court will only address the years 1985 through 1987.[3]

■ The Government based the part of its case relating to the Debtor's purportedly unreported income on the theory that any deposits into the Debtor's bank accounts during the years in question that were not otherwise demonstrated to be nontaxable transfers constituted income. This method of calculating tax liability is referred to as the "bank deposits" method.[4]

After considering the arguments and evidence, the Court finds that (1) the Debtor's income for 1985, 1986 and 1987 is accurately reflected in his income tax returns; (2) the Debtor shall be allowed Schedule C deductions in the amount of $11,350 for 1985 and $8,540 for 1986; and no Schedule C deductions shall be allowed for 1987; and (3) the Debtor shall be allowed a deduction for investment interest for 1987 in the amount of $66,691.

The Court's jurisdiction to hear this matter derives from 28 U.S.C. § 1334. It is a core proceeding under 28 U.S.C. § 157(b)(2)(B). This memorandum opinion

---

1. United States Bankruptcy Judge, Northern District of Illinois, sitting by designation.

2. The appeal is probably moot in light of this Court's disposition.

3. The parties have agreed and requested that the Court limit its findings and conclusions to the amounts of the Debtor's income and business deductions for 1985 through 1987.

4. Where the taxpayer fails to produce adequate records from which actual income may be ascertained, the IRS may use any reasonable method to calculate a potential deficiency. *See* 26 U.S.C. § 446; *Cummings v. C.I.R.,* 410 F.2d 675, 678 (5th Cir.1969); *Boyett v. Commissioner of Internal Revenue,* 204 F.2d 205, 208 (5th Cir.1953). The "bank deposits" method has been accepted as a reasonable means of determining the taxpayer's income under these circumstances. *Cummings,* 410 F.2d at 678; *Price v. U.S.,* 335 F.2d 671, 677 (5th Cir.1964).

constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052.

*Testimony*

The Debtor testified without rebuttal regarding his accumulation of wealth and his professional and business activities. He practiced law from 1981 until he was disbarred in July, 1986. He maintained a solo practice and handled proceedings from simple divorce matters to DWI's out of an office located at 3923 Lake Worth Road. During the first half of 1986, he was under criminal indictment and sanctions of the Florida Supreme Court. His criminal trial was held on June 30, 1986, resulting in a dismissal of the charges. The parties have stipulated that he ceased practicing law on July 26, 1986 after he was disbarred by the Florida and Oklahoma state courts.

The Debtor testified that he had accumulated considerable wealth prior to 1985. He testified to a net worth in 1985 of roughly $1,400,000, derived from inheritances and gifts from his father and grandmother, the law practice, real estate ventures, running two restaurants, and interest from savings accounts and CD's. He testified that money from his family went into the accounts prior to 1985, and that most of the deposits during 1985 were from share loans.[5] He testified that he took out share loans of at least $250,000 from City Federal Savings and Loan ("City Federal") to purchase investment vehicles in 1985. He testified that he borrowed over $100,000 from private sources, and that he took at least $120,000 in cash advances on his credit cards, half in 1985 and half in 1986. He testified that the private loans and cash advances went towards paying attorney's fees in defending against the pending criminal charges and towards taking care of his sick mother. He also testified that during 1985 and 1986 he deposited in increments, at Atlantic Federal Savings & Loan ("Atlantic Federal") and City Federal, $50,000 cash that he had kept in a safe in his office. He testified that he made these deposits to cover checks for court fees, expert witness fees and other expenses related to the criminal trial. He testified that the remainder of the deposits were roll-over CD's.

The Debtor testified that after being disbarred he was unemployed for the remainder of 1986, and that he did not have any income from business interests other than the practice of law during 1985 or 1986. He testified that he was self-employed in 1987, trying mobile home sales, and running an advertising agency and a security guard agency. He testified that these businesses suffered considerable losses without ever producing any profits. He produced neither business records to substantiate his claimed Schedule C expenses for the years in question nor records of any businesses other than the law practice. In March of 1986, his office was fire-bombed with two molotov cocktails, destroying two shopping bags that the Debtor testified contained his records of business expenses for 1985 and the first few months of 1986. The Debtor's landlord, Alice Simcina, corroborated his testimony that he kept his business records in the shopping bags and that they were destroyed in the fire. Another office worker, Beverly Baker, also testified that she had seen the Debtor putting business receipts in the bags, and that after the fire she saw burned and wet business papers where the bags had been kept. The Debtor testified that his records for the balance of 1986 were removed by personnel of the Florida Bar. He testified that he maintained records for 1987, but that they had been lost during his move to Arkansas.

On his 1985 tax return, the Debtor reported $11,350 in wages and $50,372 in interest income, and claimed $91,604 in Schedule C ("Profit or (Loss) From Business or Profession") deductions.

On his 1986 tax return, the Debtor reported no wages and $131,856.74 in interest income and claimed $194,161 in Schedule C deductions.

On his 1987 tax return, the Debtor reported no wages and $147,360 in interest income and claimed $154,866 in Schedule C deductions.

---

**5.** According to the testimony, share loans were loans by the bank made to its depositor of up to 90% of the amounts the depositor then had on term deposit at the bank.

The Government audited the Debtor's tax returns for 1985–1988, resulting in two Revenue Agent's Reports: one with respect to tax years 1985 and 1986 and the other with respect to the tax years 1987 and 1988. On June 27, 1989, the Government timely issued a Statutory Notice of Deficiency with respect to the tax years 1985 and 1986. The Notice of Deficiency reflected the Government's determination that a deficiency existed for 1985 in the amount of $125,222, plus certain additions to tax under 26 U.S.C. §§ 6651(a)(1), 6653(a)(1), 6653(a)(2) and 6661; and for 1986 in the amount of $231,464, plus certain additions under 26 U.S.C. §§ 6651(a)(1), 6653(a)(1)(a), 6653(a)(1)(b) and 6661.

On May 14, 1990, the Government timely issued a Statutory Notice of Deficiency with respect to 1987 and 1988. For 1987, the Notice of Deficiency reflected the Government's determination that a deficiency existed in the tax of the Debtor in the amount of $168,094, plus certain additions under 26 U.S.C. §§ 6653(a)(1)(a), 6653(a)(1)(b) and 6661. The Debtor began proceedings in the United States Tax Court on July 10, 1989 to contest the Notice of Deficiency with respect to 1985 and 1986, and on June 18, 1990 with respect to 1987 and 1988.

The Government produced a group of summary exhibits it prepared for trial, reflecting its revisions to its previous determinations of the Debtor's unreported income and allowable deductions for each of the years included in the audit. The Government revised its initial determinations based on the analysis of the available records by the trustee's expert witness, Cecilia Garber, provided to the Government the week before trial. In addition to supplementing its analysis with information it had originally omitted regarding activity of nearly a million dollars in an account (the "422 Account") at Atlantic Federal, it also adopted Garber's reductions to its deficiency determination in the amount of over $300,000 for 1986 and 1987. The Government indicates on its summary exhibits that it disputes Garber's determination of additional reductions in the amount of $163,-281.34 for 1986 and $127,500 for 1987. The Government's revisions indicate: for 1985, unreported income of $205,101.79, and allow-

able deductions of $12,390; for 1986, unreported income of $328,627.46 and allowable deductions of $9,620; and for 1987, unreported income of $243,762.78 and allowable deductions of $45,249.

Stephen Smiler, the revenue agent who conducted the audit, did not include the 422 Account, account no. 00–5100422–4, in his original calculations although it was listed on a form 1099 from Atlantic Federal that was attached to the Debtor's 1986 tax return. He testified that he had included this account on his summons to the bank, but that the bank had not provided any records for that account. Garber discovered the account when she reviewed the signature cards and the 1986 tax return. She also found a transfer slip between accounts where the 422 Account was the source account, and the money was used to purchase a CD. Rather than ignoring the existence of the account, however, she had the trustee subpoena records, which she received, incorporated in her analysis and provided to the Government during discovery. Smiler testified that after he received records of the 422 Account during discovery he added $100,754.52 in deposits and subtracted $15,337.66 that he identified as non-income items from those deposits, with a net difference of $85,416.86, which he characterized as additional unexplained deposits for 1986. For 1987, he added $787,-051.17 in deposits and subtracted $671,610.02 that he identified as non-income items, with a net difference of $115,441.15, which he characterized as additional unexplained deposits.

Smiler never interviewed the Debtor during the course of his audit. He testified that while he had arranged to meet with the Debtor, the Debtor canceled the appointment, and refused to cooperate in any way. The audit consisted solely of reviewing the Debtor's tax returns and computer runs of the Debtor's bank accounts summoned from City Federal and Atlantic Federal. Records were summoned from these banks because interest income was reported from the former on the 1985 and 1986 returns and from the latter on the 1987 and 1988 returns. The computer runs show deposits into and withdrawals from the accounts, with the dates and times of the transactions. They do not

show the source of the deposits. For 1985, Smiler worked with only one account at City Federal. He was unable to trace the source of any of the deposits. For 1986 and 1987, he worked with several accounts, including several CD accounts, among which he was able to trace transfers between accounts, thus eliminating some of the deposits as non-income deposits.

To determine unreported income, Smiler performed a "bank deposits analysis." Using the bank computer runs, he added all the deposits going into all the accounts to get gross deposits. Then he subtracted what he determined to be non-income deposits to get net deposits. Finally, he subtracted the income disclosed on the returns to get unreported income. Transfers and loans are examples of non-income deposits. Smiler testified that he could not determine the nature of every deposit into the accounts, and that if he could not determine that a deposit was non-taxable, he would treat it as income. He testified that he had no proof that any of the deposits were income, but that the Debtor's law practice was a "likely source" of income. For the period after the Debtor was disbarred, because Smiler had heard that the Debtor had been charged with practicing law without a license, he determined that the Debtor's law practice remained a likely source of income. He didn't contact anyone to ascertain whether the Debtor practiced law after he was disbarred. He didn't have any knowledge as to whether the Debtor had been convicted of practicing law without a license. He testified that his opinion of a likely source of income would remain the same notwithstanding the stipulation among the parties that the Debtor did not practice law after July, 1986. He testified that he knew of no other sources of income after that period.

Smiler testified that in conducting a bank deposits analysis he was required to examine all records of income, non-taxable transfers and other transactions, and to obtain records from third parties that could have affected the outcome of the analysis. However, Smiler failed to obtain all the records that were available at the time of the audit, and the bulk of the records that would have indicated the sources of the deposits on which he based his analysis have been discarded. Catherine Poulos, a Service Administrator for Bank Atlantic, the successor to Atlantic Federal, testified that the bank's policy was to retain records for only five years. Annabel Nemrow, an employee of Great Western Bank, the successor to City Federal, testified that both Great Western and City Federal retained records for only seven years. Smiler testified that he thought the banks in the area maintained records such as deposit and withdrawal slips, and records of the checks that were deposited, and that his usual practice when he received incomplete responses to his summons was to follow up with calls to the bank, or with enforcement proceedings, to make sure he received all the records. He testified that, in spite of the clear references to the 422 Account, he did not follow up in this case because he had no reason to believe that the records he received were incomplete. He testified that he presumed that the few records he received were the only ones the banks kept for these accounts.

Smiler admits that he had an incomplete picture of income. He testified that had he met with the Debtor, the picture could have been filled in, and that even without the help of the Debtor, had he obtained the underlying bank records, he could have established the income for the year. When, in response to his summons, the bank sent him computer runs and a few withdrawal and deposit slips, he did not attempt to obtain the underlying documents. He reasoned that he had asked for everything in the summons, and with the presumption of correctness favoring his analysis, he could construct a picture based solely on the computer runs. He testified that had he obtained the deposit slips he would have been able to discern the nature of the transactions.

The integrity of Smiler's analysis is substantially undermined by the scope and nature of revisions he made in preparing for trial. He included information that Garber discovered and provided to him regarding an account with activity of nearly a million dollars. In addition, Smiler agreed with many of the errors that Garber found in his initial analysis based on records that were already

available. The fact that he disputes several characterizations by Garber of deposits as non-income does not dispel the persuasive evidence that his analysis is not credible. Moreover, in those areas where Smiler and Garber disagree, her analysis appears well reasoned, while his is premised on the notion that all deposits are non-income despite evidence to the contrary if there is no source document specifying it is non-income. His approach appears to be directed more towards punishing the Debtor for being uncooperative than towards constructing a reasonable depiction of the Debtor's banking activity.

Garber is a CPA with accounting experience in bankruptcy and tax matters. Based on a review of the computer runs, savings retention statements, signature cards and loan documents, she analyzed whether any of the deposits that Smiler had determined were income were actually non-income deposits. Garber disagrees with Smiler's characterization of the banking activity in the 422 Account. For 1986, Smiler determined that of $100,754.52 in deposits, $15,337.66 represented either transfers or loan proceeds, netting an addition to his original deficiency calculation of about $85,000. Of the $85,000, Garber testified that $73,356.86 was interest income, and had already been included in the $131,856.74 that Katz had reported as interest income. Garber looked at the individual entries in the account and compared them to signature cards provided by Bank Atlantic for the corresponding dates. She noted that CD's in the bank's bonus program [6] were purchased on the same dates on which several of the deposits were made. She then calculated what the bonus amounts would have been for each of the CD purchases, and saw that those exact amounts were the amounts deposited. She verified her findings against the form 1099's from Bank Atlantic attached to the Debtor's 1986 tax return, ensuring that the deposits were included in the interest reported by the bank relative to the CD purchases and taking into account the interest on each CD that would have been earned exclusive of the bonus amounts. She testified without rebuttal that she was able to account for bonus payments for each of the CD's bought during the year.

While Smiler agreed with Garber that he had improperly characterized $99,150.75 in deposits as income deposits during 1986, he disagrees with an additional $163,281.34 that Garber would also characterize as non-income. Garber based her characterization on a picture she constructed of the Debtor's banking transactions during 1985 and 1986 by examining the deposits entry by entry for 1985 and 1986 and the few deposit slips that were available. The $163,281.34 is comprised of five transactions that in her opinion matched the pattern of identified transfers from CD's, and did not fit the pattern of the other transactions that in her opinion reflected income. The disputed deposits were in the amounts of $20,000, $5,000, $19,000 (apparently a $20,000 deposit with a $1,000 cash withdrawal), $96,000 and $23,281,34, all made during August and September of 1986.

Garber also disagrees with Smiler's analysis of activity in the 422 Account in 1987. Smiler noted $787,051.17 of deposits into the account, of which he determined that $671,-610.02 was not income. Of the $115,441 that Smiler characterized as income, Garber testified that in her opinion $94,692 was comprised of both interest income from bonus CD's already reported on the Debtor's tax return, and transfers from account no. 05–1440897 (the "897 Account"), an account for which the Government provided the records to Garber. She based her opinion regarding interest income on the same type of analysis described above for 1986. For deposits between September and December, where she noted large or even-number deposits into the 422 Account, raising the prospect of a transfer, she found withdrawals from the 897 Account of the same amounts on the same days. Garber testified that she was not able to explain and trace all of the deposits because she ran out of time and records and that she might have been able to explain them had the records been made available.

6. From the testimony, it appears that bonuses were paid to the Debtor upon purchasing certain CD's. These bonuses would be in the nature of investment income since they arose from the purchase of investment vehicles.

As was the case regarding Garber's analysis of 1986 deposits, Smiler accepted and adopted some of Garber's reductions to his analysis for 1987 and disputed others. He adopted $207,860 in reductions, and disputed another $127,500 that in Garber's opinion represents non-income.[7] Garber based her characterization of the disputed deposits on a pattern-of-deposits analysis and comments on signature cards that were included among the available records. One of these deposits in the amount of $20,000 was determined to be non-income because it did not fit within the pattern of deposits that she characterized as income. The signature cards for three of the deposits in the aggregate amount of $25,000 bore the names Avery Leinson and Henry Walden, men from whom the Debtor testified he received private loans. Four of the deposits in the aggregate amount of $65,000 referenced transfers from City Federal. One of the deposits in the amount of $5,000 referenced a transfer from the 422 Account and one of the deposits indicated a cash advance in the amount of $5,000. The Court agrees with Garber's reasoning that, in addition to the references on the signature cards, the large and even nature of these numbers indicates a likelihood that the deposits are non-income in nature.

*Investment Interest*

In 1987, Atlantic Federal reported to the Government that the Debtor paid $66,691 in interest. Smiler allowed only 65% of that amount, $40,809, as a deduction, in accordance with the limit on personal loan interest. *See* 26 U.S.C. §§ 163(d)(6)(B) and 163(h)(6). Had the interest payments been identified with the purchase of investment vehicles, then the total $66,691 would have been allowed as a business education. *See* 26 U.S.C. § 163(a). Smiler failed to tie loan proceeds directly to the purchase of investment vehicles. Garber, however, testified that in her opinion the interest was properly characterized as investment interest. She traced the proceeds of each loan on which interest payments were made, and determined that the proceeds went either directly to the purchase of CD's, or into the 422

Account, and shortly thereafter to the purchase of CD's. The Court finds that Garber's testimony with respect to the Debtor's claimed investment interest for 1987 is sufficient to overcome the prima facie validity of this aspect of the Government's claim, shifting the burden back to the Government to prove its claim. Because the Government has failed to offer any credible evidence with respect to the nature of the interest expense, the Court finds the deduction allowable in full as investment interest.

*Burden of Proof*

■ Although the parties have devoted much of their arguments to the effect of the bankruptcy on the burden of proof in determining the Debtor's tax liability, in actuality the bankruptcy does not alter the burden under the current facts. Generally, outside of bankruptcy the burden of persuasion is on the taxpayer to show that the amount sought by the government is erroneous. *Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *U.S. v. Rexach*, 482 F.2d 10 (1st Cir.1973). However, even outside of bankruptcy, once a taxpayer has shown the Government's deficiency determination to be arbitrary and excessive, the presumption of correctness ordinarily accompanying a deficiency determination is overcome, and the Government must come forward with evidence to prove the existence and amount of the deficiency. The Supreme Court stated: "We find nothing in the statutes, the rules of the Board or our decisions that gives any support to the idea that the Commissioner's determination shown to be without rational foundation and excessive will be enforced unless the taxpayer proves he owes nothing or, if liable at all, shows the correct amount." *Taylor*, 293 U.S. at 514, 55 S.Ct. at 290. *See also U.S. v. Janis*, 428 U.S. 433, 442, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046 (1976); *Cebollero v. C.I.R.*, 967 F.2d 986, 990 (4th Cir.1992); *Portillo v. C.I.R.*, 932 F.2d 1128, 1133 (5th Cir.1991); *Muserlian v. C.I.R.*, 932 F.2d 109, 112 (2d Cir.1991); *Zuhone v. C.I.R.*, 883 F.2d 1317,

---

7. There was some uncertainty, immaterial to the present discussion, as to whether the amount in dispute was $125,000 or $127,500.

1325 (7th Cir.1989); *Clapp v. C.I.R.*, 875 F.2d 1396, 1403 (9th Cir.1989).

■■■ In bankruptcy, where a party presents a colorable objection to a proof of claim, sufficient to overcome the prima facie effect operating in favor of the creditor pursuant to 11 U.S.C. Section 502(a) and Fed.R.Bankr.P. 3001(f),[8] the claimant bears the ultimate burden of persuasion, even when the claimant is a taxing authority. *In re Gran*, 964 F.2d 822, 827 (8th Cir.1992); *In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988); *Rasbury* 141 B.R. at 758–759; *In re All American of Ashburn, Inc.*, 156 B.R. 696, 701 (Bankr.N.D.Ga.1993); *Premo*, 116 B.R. at 524. The testimony of the Debtor and Garber was sufficient to overcome the prima facie validity afforded the Government's proof of claim with respect to unreported income for 1985–87 and investment income for 1987. Regardless of whether they presented sufficient evidence to reconstruct the Debtor's taxable income with a high degree of accuracy, they proved significant flaws, many of which the Government did not dispute, in the Government's calculations. The burden of persuasion was thereby effectively shifted to the Government, and it failed to respond with additional evidence in support of its claim.

Because the Plaintiffs have shown the Government's deficiency determination was based on a faulty bank deposits analysis, the burden shifted to the Government of coming forward with other credible evidence to support its claim. Because the Government failed to procure bank records that would have enabled it to present a credible portrait of the Debtor's income from 1985 through 1987, the Court has no credible evidence before it to support the Government's claim with respect to unreported income. Therefore, even outside of bankruptcy, the Government would not be able to sustain its claim.

The Government's claim fails through its own slipshod methodology. It is obvious from the presentation of its case that at least in this instance it relied on the taxpayer's unwillingness to cooperate as justification for conducting a cavalier, incomplete audit, resulting in an arbitrary and excessive determination of deficiency. The Government failed to discover a bank account with activity of nearly a million dollars although its existence was disclosed on the Debtor's tax returns. In the course of the trial it has made yet other revisions of hundreds of thousands of dollars based on Garber's more thorough analysis, which is itself necessarily constructed on an incomplete set of records. The Government failed to competently analyze the data in its possession, ignoring obvious correlations between share loans and deposits, share loans and CD purchases and CD bonuses and deposits, all of which would have materially affected its calculations. Finally, the Government failed to obtain records available at the time of its audit from which an accurate picture of the Debtor's banking activity could have been drawn, both in completing its audit and in support of its claim in bankruptcy. To say that the Government has failed to meet its burden is an understatement. Because the Government has presented no credible evidence in support of that part of its claim based on unreported income, the Court finds the Debtor's income for 1985 through 1987 to be as reported on his tax returns.

*Deductions*

■■■ The Government's disallowance in part of the Debtor's claimed business ex-

---

**8.** *See In re Fidelity Holding Co. Ltd.*, 837 F.2d 696, 698 (5th Cir.1988) (objecting party must produce evidence rebutting the government's claim to defeat claim); *I.R.S. v. Levy*, 130 B.R. 28, 32 (E.D.Va.1991) (debtor must present evidence supporting its objection to tax claim to shift burden of proving claim back to government); *In re Federated Dept. Stores, Inc.*, 135 B.R. 950, 958 (Bankr.S.D.Ohio 1992) (government carries burden of establishing its claim by preponderance of the evidence only after taxpayer debtor rebuts the presumption of the validity of the claim); *In re Butcher*, 100 B.R. 363, 367 (Bankr.E.D.Tenn.1989) (upon filing objection, trustee must produce evidence and show facts tending to defeat the government's claim); *In re Hudson Oil Co., Inc.*, 91 B.R. 932, 945 (Bankr. D.Kan.1988) (trustee must produce evidence to overcome prima facie effect of government's claim regarding debtor's claimed tax deduction); *In re Unimet Corp.*, 74 B.R. 156, 165 (Bankr. N.D.Ohio 1987) (trustee must produce "evidence of probative force equal to that of the allegations of the creditor's proof of claim to rebut the presumption in favor of the creditor").

penses shall stand. Outside of bankruptcy, a taxpayer must substantiate any claimed business deductions. "[T]he burden is upon the taxpayer to establish a statutory right to specific deductions and to substantiate his eligibility therefor." *Cummings*, 410 F.2d at 679; *see also Bishop v. C.I.R.*, 342 F.2d 757, 759 (6th Cir.1965); *Cirillo v. C.I.R.*, 314 F.2d 478 (3rd Cir.1963); *Nowland v. C.I.R.*, 244 F.2d 450, 453 (4th Cir.1957). In bankruptcy, while the claimant bears the ultimate burden of persuasion, the objector's burden to come forward with evidence rebutting a claim based on the disallowance of tax deductions is akin to the taxpayer's burden to substantiate the deductions. The Debtor has failed to come forward with sufficient evidence to rebut that aspect of the Government's claim relating to business expense deductions. Therefore, that aspect of the Government's claim based on its disallowance in part of the Debtor's claimed Schedule C deductions shall stand, and the Plaintiffs' objection with respect thereto is overruled.

The Plaintiffs' evidence is insufficient to substantiate the Debtor's claimed business deductions. On the income side of the case there is evidence of share loans, transfers and CD rollovers, all serving to rebut the Government's claim that the Debtor's deposits were unreported income. Regarding deductions, however, the Plaintiffs have offered no evidence other than the Debtor's itemized Schedule C's, the Debtor's general testimony of his failed businesses and the expenses related thereto, and the testimony of the Debtor's landlord with respect to office rent. The Court finds that only the latter testimony is specific enough to overcome the prima facie effect of the Government's claim that the Debtor's claimed business deductions should be disallowed in part.

The Debtor testified regarding some of the amounts he reported on his Schedule C forms. He testified that the $1,750 he claimed as an insurance expense for 1985 included everything from renter's insurance to car insurance, and health and life insur-ance. Although he recalled testifying at a deposition that the figure included payments for his mother's insurance, he testified at trial that his health policy was almost $100 per month and that his life insurance was at least $200 per year. He testified that he spent roughly $2,200 per year during the three years in question on dry cleaning his suits; and $8,500 in 1985 and $27,500 in 1986 on his criminal defense. Plaintiffs did not introduce any other evidence in support of the deductions itemized on the tax returns. The Court finds that the evidence regarding the claimed deductions is insufficient to rebut the Government's partial disallowance thereof. Notwithstanding the specific testimony of the landlord regarding office rent in the amount of $250 per month for 1985 and 1986, and the Debtor's testimony regarding insurance in the amount of roughly $1,400 for 1985, the deductions previously allowed by the Government are large enough to encompass those amounts. Therefore, the Government's allowance for Schedule C expenses in the amounts of $11,350 for 1985, $8,540 for 1986 and no allowance for 1987 shall stand.[9]

*Pending Motions*

All motions pending in this adversary proceeding are hereby denied in accordance with the Court's order of even date. Pending motions brought during trial include (1) the motions for judgment as a matter of law brought separately by the Government, the trustee and the Debtor, and (2) the requests for sanctions, brought separately by the trustee and the Debtor. Pending motions brought after trial include (1) the Debtor's Motion for Sanctions, (2) the Debtor's Motion to Strike I.R.S.' Claim and for Sanctions, (3) the Debtor's Motion to Strike Reply Brief and for Sanctions, and (4) the Debtor's Motion for a Default Judgment and Costs Against Defendant. The motions for judgment as a matter of law are denied because questions of fact remained at the times the motions were brought. The motions for sanctions are denied because the Court finds that the actions complained of do not constitute sanctionable conduct. The Debtor's mo-

---

9. The *Cohan* rule, invoked by the Debtor, does him no good where the Court finds the evidence insufficient to enable it to reasonably determine the amount of expenses. *See Cohan v. C.I.R.*, 39 F.2d 540 (2d Cir.1930) (where the court may reasonably determine the amount of expenses, evidence showing the exact amount of expenses not required).

tions to strike the Government's reply brief and for default judgment are denied as the Court does not find that they presented just cause for the relief requested.

### Conclusion

For the reasons stated herein, (1) the Plaintiffs' objection to the Government's claim is hereby sustained in part and overruled in part; (2) the Debtor's income for the years 1985–1987 is hereby determined to be the amounts reported on the Debtor's income tax returns; (3) the Debtor's Schedule C deductions shall be allowed in the amounts of $11,350 for 1985 and $8,540 for 1986; and no Schedule C deductions shall be allowed for 1987; and (4) the Debtor shall be allowed a deduction for investment interest for 1987 in the amount of $66,691. The Government is hereby directed to prepare and file within 21 days of the date hereof, a final order, subject to the Plaintiffs' review, incorporating the Court's ruling.